**OnBANK & TRUST CO., Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORP., Statutory Successor to Resolution Trust Corp., as Conservator of Columbia Banking Federal Savings and Loan Association and as Receiver of Columbia Banking Federal Savings and Loan Association, Defendant.**

No. 95–CV–6640L.

United States District Court, W.D. New York.

June 17, 1997.

---

Jay B. Kasner, Helen L. Monaco, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, Stephen T. Helmer, MacKenzie, Smith, Lewis, Michell & Hughes, Syracuse, NY, for OnBank & Trust Co.

Edward G. Case, Carolyn G. Nussbaum, Nixon, Hargrave, Devans & Doyle, LLP, Rochester, NY, for Resolution Trust Corp., F.D.I.C.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, OnBank & Trust Co. ("OnBank"), brings this action under § 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. This action arises out of a dispute concerning OnBank's purchase of certain securities from Resolution Trust Corporation ("RTC") in 1994. OnBank alleges that because of certain acts and omissions on the part of RTC, the securities were not worth as much as OnBank believed them to be, and that RTC concealed that fact from OnBank. Based on these allegations, OnBank asserts a cause of action under § 10(b), as well as state law claims for fraud and breach of contract. Defendant, the Federal Deposit Insurance Corporation ("FDIC"),[1] has moved to dismiss the complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

In June 1992, RTC accepted appointment as conservator for Columbia Banking Federal Savings and Loan Association ("Columbia"). In May 1994, RTC announced that it planned to sell Smith Barney Mortgage Capital Corp. Series 1989–1 Mortgage Pass–Through Certificates ("the Certificates") and servicing rights with respect to the mortgage loans relating to the Certificates ("the servicing rights"), which were owned by Columbia. Mortgage pass-through securities are formed when mortgages are pooled and undivided interests in the pool are sold to investors. As payments of principal and interest are made on the underlying mortgage loans, the payments are passed through a trustee to the holders of the certificates. When all the mortgages in the pool have matured or been paid in full, the investor has received back its entire principal, and no further payments are made.

The servicing rights comprised both obligations to service and administer the mortgage loans, as well as the right to receive servicing fees, including assumption fees and late-payment charges. Together, the Certificates and the servicing rights constituted the trust fund of a qualifying real estate mortgage investment conduit ("REMIC").

RTC announced that it would accept bids on the Certificates. As a prospective bidder, OnBank was sent a bid package by RTC, which included a Prospectus, a Pooling and Servicing Agreement, and certain information regarding the mortgage loans.

The bid package stated that the securities for sale consisted of four series of certificates: Class A (Senior), Class B–1 (Subordinate), Class B–2 (Residual), and Class B–3 (Residual). The four classes of Certificates were subject to different treatment with regard to payments, losses, etc., as will be discussed in more detail below.

The Prospectus, which was written in 1989 when the Certificates were first issued, stated that "[t]he Certificates of each series initially will have an aggregate Certificate

---

1. The Federal Deposit Insurance Corporation ("FDIC"), which is the statutory successor to RTC, was substituted as the defendant in this action with the consent of all parties on April 22, 1996.

Principal Balance equal to the outstanding principal balance of the Trust Fund Assets included in the related Trust Fund ..." The *Prospectus* stated that the Certificate Principal Balance "represents the maximum dollar amount (exclusive of interest thereon) to which the holder thereof is entitled from future cash flow on the assets in the related Trust Fund." Prospectus (Exhibit F to Ann Richards Affidavit) at 5–6. The Certificate Principal Balance, then, represented the total amount of principal that the holder of the Certificate could expect to receive.

Thus, the Prospectus indicated that the total Certificate Principal Balance would "initially" equal the outstanding principal balances of the underlying mortgages. In addition, the Prospectus Supplement, which was also issued in 1989, stated that "[t]he Mortgage Pool consists of adjustable rate Mortgage Loans with an aggregate principal balance ... of $151,033,006.77." The Prospectus Supplement further stated that the Certificate Principal Amount of the Class A Certificates was $137,440,036.16, and that the Certificate Principal Amount of the Class B Certificates was $13,592,970.61, or $151,-033,006.77 in total. Prospectus Supplement (Exhibit G to Ann Richards Affidavit) at S–3 through S–5.

The *Prospectus* also stated that "[t]he outstanding Certificate Principal Balance of a Certificate will be reduced to the extent of distributions of principal thereon, and in the case of Certificates evidencing interests in a Trust Fund that includes Residential Loans, by the amount of any Realized Losses ... allocated thereto." Prospectus at 52. A realized loss would be a loss on a residential loan, such as a loss occurring when principal remained unpaid following foreclosure on a defaulted loan. Prospectus at 54.

The Prospectus, Prospectus Supplement, and the Pooling and Servicing Agreement further stated that realized losses would first be allocated to the Subordinate (B–1) Certificates prior to allocation to the Senior (A) Certificates. Prospectus at 54; Prospectus Supplement at S–11; Pooling and Servicing Agreement at 74–75. The Pooling and Servicing Agreement stated on page 75 that allocations of realized losses would "be made by reducing the Certificate Principal thereof, by the amount so allocated ...."

The May 27, 1994 bid package that RTC sent to OnBank stated that as of April 25, 1994, the B–1 Certificates had a remaining principal amount of $13,593,020. Ann Richards Affidavit Ex. A. OnBank alleges that based upon the above-quoted statements from the 1989 Prospectus, Prospectus Supplement, and the Pooling and Servicing Agreement, it concluded from the $13,593,020 figure in the bid package that no losses had been assessed against the mortgage loans because the B–1 Certificate Amount had not decreased from the amount indicated in the Prospectus Supplement. Because the Prospectus stated that "[t]he Certificates of each series initially will have an aggregate Certificate Principal Balance equal to the outstanding principal balance of the Trust Fund Assets included in the related Trust Fund," OnBank believed that the actual balance on the underlying mortgages was equal to the amount stated in the bid package.

In fact, that was not the case. The face value of the Certificates exceeded the remaining principal balance of the mortgage loans by nearly a million dollars. Plaintiff alleges that this was due to improper or inadequate servicing, either by Columbia or by RTC, which serviced the loans after its appointment as Columbia's receiver.

OnBank then prepared and submitted a bid based on its erroneous belief that there was a dollar-for-dollar parity between the Certificate Principal Amounts as stated in the bid package and the outstanding principals on the mortgage loans. The significance of this misapprehension, according to plaintiff, is that OnBank's reason for wanting the Certificates was not that it wanted simply to collect the interest and principal payments to which it would be entitled as the holder of the Certificates; rather, OnBank intended to "collapse" the REMIC upon purchase of the Certificates, thereby owning the mortgage loans directly. OnBank then intended to use the relationships that it thereby established with former Columbia customers to expand its own customer base. Thus, plaintiff alleges, the actual value of the mortgage loans

was a material fact related to OnBank's decision on the amount of its bid.

On June 14, 1994, OnBank submitted a bid for 103.125% of the Certificate Principal Amount. The same day, RTC notified OnBank that OnBank was the winning bidder.

On June 24, 1994, OnBank and RTC entered into a Sale of Certificates and Servicing Rights Agreement ("the Agreement"). The Agreement stated that the "remaining principal amount" of the Class A Certificates was $30,007,267.78, and that the "remaining principal amount" of the Class B-1 Certificates was $13,593,019.55, a total of $43,600,287.33. Based on OnBank's bid of 103.125% of the principal amount, the sales price (including interest and premiums) totalled $45,112,234.82. Pursuant to the Agreement, the Certificates and servicing rights were conveyed to OnBank on July 29, 1994.

On August 3, 1994, OnBank discovered the disparity between the Certificate Principal Amount and the balance on the mortgage loans. At that point, the mortgage loan balance stood at $41,804,007.96, which was $997,754.46 less than the Certificate Principal Amount of $43,600,287.33. Applying the 103.125% factor to the amount of the disparity, OnBank alleges that it paid $1,008,309.30 for loans that did not exist.

OnBank commenced the instant action on December 29, 1995. The amended complaint asserts three causes of action: (1) breach of contract; (2) common-law fraud; and (3) securities fraud under 15 U.S.C. § 78j(b) and Rule 10b-5.

## DISCUSSION

### I. Common–Law Fraud and Securities Fraud Claims

■ To make out a prima facie securities fraud claim under § 10(b) of the Act, a plaintiff must allege that: in connection with the purchase or sale of securities, defendant made a false statement or omission with respect to a material fact; defendant acted with scienter, i.e., intent to deceive; plaintiff reasonably relied upon the misstatement or omission; and plaintiff was harmed as a result. *Feinman v. Dean Witter Reynolds, Inc.,* 84 F.3d 539, 540 (2d Cir.1996); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 808 (2d Cir.1996); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995). The elements of common-law fraud under New York law are similar: a material, false representation; intent to defraud; reasonable reliance on the representation; and damage to the plaintiff as a result. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995); *Keywell Corp. v. Weinstein,* 33 F.3d 159, 163 (2d Cir.1994); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987).

■ In the case at bar, defendant contends that plaintiff's factual allegations do not support plaintiff's allegation of reliance. Defendant bases this argument on the following sections of the Agreement:

5.5 *Due Diligence.* Purchaser understands and agrees that it is solely responsible for conducting a due diligence investigation of the Mortgage Loans, Servicing Rights (including, without limitation, the Loan Documents) and the Certificates, and that Purchaser is buying the Certificates and the Servicing Rights "as is" without any representation or warranty except as expressly provided in this Agreement and, except as provided in Section 2.3, without recourse against the Seller or the RTC.[2]

5.6 *Purchaser Qualifications.* Purchaser (a) is a substantial, sophisticated investor having such knowledge and experience in financial and business matters and, in particular, in such matters related to securities similar to the Certificates, that it is capable of evaluating independently the merits and risks of investment in the Certificates, and (b) is able to bear the economic risks of such an investment (including a total loss of its investment).

5.7 *Access to Information.* Purchaser has been finished with, and has had an opportunity to review and has reviewed, all financial data and other information relat-

---

**2.** The Agreement used the term "Seller" when referring to RTC in its corporate capacity, and "RTC" when referring to RTC in its capacity as conservator for Columbia.

ing to the Servicing Agreement, the Loan Documents, the Certificates and the Servicing Rights requested by Purchaser. Purchaser has had any questions arising from or relating to such review answered to the satisfaction of Purchaser. Purchaser has not relied upon the Thrift, the Seller or the RTC or any of their respective employees, counsel, or agents with respect to any information regarding the Certificates or the Servicing Rights.

Defendant asserts that these representations by OnBank preclude plaintiff from attempting to prove reliance, and that even if OnBank could show reliance, these representations would render that reliance unreasonable as a matter of law.

In support of this contention, defendant relies primarily on the New York Court of Appeals' holding in *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959), that a specific disclaimer of reliance in a contract "destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations." The Second Circuit "ha[s] recognized a similar principle in the securities fraud context." *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir.1996) (citing *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1033 (2d Cir. 1993)).

Plaintiff does not deny the general validity of this principle, nor does it deny that it made express representations of nonreliance. Plaintiff, however, contends that this case falls within the exception enunciated in *Danann* for "factual situations wherein the facts represented were matters peculiarly within the defendant's knowledge ..." 5 N.Y.2d at 322, 184 N.Y.S.2d 599, 157 N.E.2d 597. In such situations, even express disclaimers of reliance may not be given effect. *Banque Arabe*, 57 F.3d at 156; *Alloy Briquetting Corp. v. Niagara Vest, Inc.*, 756 F.Supp. 713, 723–24 (W.D.N.Y.1991); *Stambovsky v. Ackley*, 169 A.D.2d 254, 259, 572 N.Y.S.2d 672 (1st Dep't 1991).

Plaintiff contends that the disparity between the Certificate Principal Amount and the mortgage loan balance was peculiarly within RTC's knowledge. OnBank asserts

that as the servicer of the loans, RTC knew of the discrepancy because it knew that certain loans had been paid off but that the B–1 Certificate Principal Amount had not been reduced accordingly.

Although the issue is a close one, I find that plaintiff has alleged sufficient facts to survive a motion to dismiss. In reaching that conclusion, I am mindful of the fact that this is a motion to dismiss, not a motion for summary judgment. On a motion to dismiss, the allegations made in the complaint must be accepted as true. *See O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 677 (2d Cir.1991); *Easton v. Sundram*, 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied*, 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). In addition, the allegations must be construed, and all inferences must be drawn, in the plaintiff's favor. *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991); *Finnegan v. Campeau Corp.*, 915 F.2d 824, 826 (2d Cir.1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1624, 113 L.Ed.2d 721 (1991); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1098 (2d Cir.1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989); *see also Pentland USA, Inc. v. Millfeld Trading Co.*, 841 F.Supp. 1383, 1385 (S.D.N.Y.1993) (on motion to dismiss securities fraud case, court must read complaint generously, and draw all inferences in favor of plaintiff).

In order for the court to dismiss a complaint under Rule 12, therefore, it must appear beyond doubt that plaintiff can prove *no* set of facts entitling him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Hartford Fire Insurance Co. v. Federated Department Stores, Inc.*, 723 F.Supp. 976, 981 (S.D.N.Y. 1989). As the Supreme Court has explained, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Assessing the sufficiency of the complaint under these standards, I cannot say at this stage that under no set of facts could plaintiff prevail on its fraud claims. There are a number of issues of fact in this case that simply cannot be resolved on a motion to dismiss. In general, these issues relate to: what information was known to RTC, but not to OnBank, prior to the formation of the contract; whether that information was "peculiarly within" RTC's knowledge, and whether it was available to OnBank; whether RTC made any material misrepresentations to OnBank; and OnBank's ability to have discovered the discrepancy between the Certificate Principal Amount and the actual loan balance prior to the date on which the servicing rights and obligations were transferred to OnBank.

The chief issue in this regard is whether this case falls within the exception in *Danann* for matters peculiarly within the knowledge of the party relying on the other party's disclaimer. Defendant contends that OnBank either had, or could have obtained upon request, information that would have revealed the discrepancy, and that OnBank failed to examine that information. In particular, defendant asserts that there existed a "servicing tape" on which was recorded the servicing history of the loans, which would have revealed to OnBank the actual loan balance. Defendant also contends that a "Statement to Certificateholders" in the bid package showed a "Remaining Principal Balance" nearly one million dollars higher than the "Scheduled Principal Balance of Mortgage Loans after Distribution."

On the present record, however, it is not completely clear whether this information was fully available to OnBank prior to the transfer date. The complaint alleges that the information provided in the bid package "would have revealed no irregularities in the Mortgage Loans and did not reveal the imbalance." Complaint ¶ 24. In addition, plaintiffs counsel stated at oral argument the servicing tape "was not made available in due diligence ..." Transcript, Mar. 25, 1997, at 14.

Defendant may be correct in its assertion that the facts were ascertainable by OnBank prior to the formation of the contract. If after a period of discovery that proves to be the case, plaintiffs claims may fail. As stated, however, on this motion, the allegations of the complaint must be accepted as true, and all inferences must be drawn in plaintiff's favor. For purposes of this motion, then, I must assume the truth of plaintiff's allegation that the facts were not made available to it until after the servicing transfer date.

OnBank also contends that in the banking and finance industry, it is standard practice to maintain a dollar-for-dollar parity between the certificate principal balance and the actual loan balance, and that the disparity in this case was so unusual that a reasonable person in OnBank's position would not have sought specific information to confirm the actual loan balance prior to submitting its bid and entering into the contract. FDIC takes the position that the reasonableness of OnBank's conduct during its due-diligence investigation is irrelevant because of OnBank's representations in the Agreement that it had undertaken an investigation and that it had received all the information it needed. Defendant contends that OnBank's disclaimers preclude it as a matter of law from pursuing its claims in this case, regardless of the extent to which OnBank did in fact undertake an investigation.

Based on plaintiff's allegations, however, I believe that issues of fact exist concerning whether the existence of the disparity was peculiarly within RTC's knowledge; if it was, this case might fall within the *Danann* exception. If this type of disparity was truly extraordinary, this case could be analogous to cases such as *Alloy Briquetting*, 756 F.Supp. 713, and *Tahini Investments, Ltd. v. Bobrowsky*, 99 A.D.2d 489, 470 N.Y.S.2d 431 (2d Dep't 1984), in which the courts held that issues of fact existed concerning whether the plaintiffs could reasonably have discovered hidden defects in land that were not disclosed by the defendants.

Whether RTC had a duty to disclose the disparity to OnBank is also a factual issue at this stage. In a business transaction, a duty to disclose may arise "where one party possesses superior knowledge, not

readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984). The complaint alleges that RTC knew that OnBank intended to "collapse" the REMIC so that OnBank would own the mortgage loans directly. The actual loan balance was therefore an important fact with respect to the value of the REMIC to OnBank. Furthermore, even if OnBank had simply planned to hold the Certificates and collect payments as the certificateholder, the value of the Certificates would still have been less than OnBank believed, since the amount of principal remaining was $1.1 million less than it appeared from the face of the Certificates. Based on the allegations of the complaint, then, it cannot be said at this stage that under no set of facts could it be found that RTC did have superior knowledge and a duty to disclose the facts to OnBank.

Another issue is whether the prospectus and the other materials in the bid package contained any false information. OnBank alleges that the statements in the bid package that the total Certificate Principal Balance would initially equal the outstanding principal balances of the underlying mortgages, that the outstanding Certificate Principal Balance of a Certificate would be reduced to the extent of distributions of principal and any losses, and that the principal amount of the B–1 Certificates was the same when On-Bank submitted its bid in 1994 as it had been in 1989, combined to effectively represent that the outstanding loan balance at the time of OnBank's bid was equal to the principal amount of the Certificates. Again, it is simply not possible at this juncture to conclude

that OnBank will be unable to adduce facts to support this allegation.

Defendant also cites the Second Circuit's decision in *Harsco* for the proposition that a fraud claim cannot be sustained where contractual disclaimers preclude allegations of the element of reasonable reliance. *See Harsco,* 91 F.3d at 345. The Second Circuit has subsequently recognized, however, that under New York law relating to fraud, it is not necessary for the plaintiff to prove that the correct information "was available only to the defendant and [was] absolutely unknowable by the plaintiff before reliance can be deemed justified." *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1542–43 n. 9. (2d Cir.1997). *See also Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir. 1980) ("indeed some cases have imposed liability in situations in which plaintiff could have determined the truth with relatively modest investigation").[3]

■ I am also not persuaded by defendant's assertion that plaintiff has not adequately pleaded scienter. Under 15 U.S.C. § 78u–4(b)(2), which was enacted as part of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the complaint in a securities fraud action must "with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." This standard is based on the standard that had been applied in the Second Circuit prior to the passage of PSLRA, which "require[d] plaintiffs to allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).[4]

---

3. I recognize that *Lazard Freres* involved only a common-law fraud claim and not a federal securities fraud claim. Even assuming that the burden on the plaintiff is heavier under the federal securities laws, however, I remain convinced that factual issues exist concerning whether under the *Danann* exception (which applies to securities fraud claims, *see Harsco,* 91 F.3d at 345) the existence of the disparity was so peculiarly within RTC's knowledge that OnBank should not be bound by the disclaimers.

4. Defendant contends that the pleading standard under PSLRA is higher than the previous Second Circuit standard. Defendant bases this assertion

primarily on a House Conference Report stating that "[b]ecause the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." H.R.Conf.Rep. 104–369, at 41 (1995). In a footnote, the report states, "[f]or this reason, the Conference Report [sic] chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness." *Id.* n. 23. Courts have differed over whether that case law remains valid; *see Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205, 208 (S.D.N.Y.1997) (collecting cases).

In addition, Rule 9(b) requires "averments of fraud" and "the circumstances constituting fraud" to be pleaded "with particularity." Therefore, a securities fraud complaint "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Shields*, 25 F.3d at 1127–28 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

In the case at bar, plaintiff has identified a number of documents, such as the Prospectus, Prospectus Supplement, and the Pooling and Servicing Agreement, that it alleges contained fraudulent statements because they indicated that the Certificate Principal Amount would be reduced to reflect losses and distributions of principal. The complaint also alleges specific conversations between identified individuals from OnBank and RTC during the contract negotiations when RTC failed to disclose the disparity, despite RTC's alleged knowledge of the disparity and its knowledge that OnBank intended to collapse the REMIC after the deal was consummated. *See* Amended Complaint ¶¶ 15–25.

Plaintiff has also satisfactorily pleaded facts giving rise to a strong inference of fraudulent intent. OnBank alleges that RTC knew that the Certificates were worth over a million dollars less than OnBank believed them to be, and deliberately failed to inform OnBank of that fact so that OnBank would submit a higher bid. Although I recognize that it is not sufficient merely to allege that it was in defendant's economic self-interest to commit fraud, *Shields*, 25 F.3d at 1130, the allegations here go beyond that. Plaintiff does not simply rely on RTC's alleged desire to generate a high bid; OnBank alleges that RTC deliberately and knowingly misrepresented the value of the Certificates. That sort of conscious behavior meets the pleading requirements of § 78u–4(b)(2) and the Sec-

ond Circuit. *See San Leandro*, 75 F.3d at 813.

## II. Contract Claim

The contract claim is based primarily on section 2.3 of the Agreement, which states that

> the Seller shall be liable for all Servicing Obligations which are incurred or which relate to any time period prior to and including the Servicing Transfer Date. Subject to the provisions of paragraph (b) hereof, Purchaser shall be liable for all Servicing Obligations which are incurred or which relate to any time period after the Servicing Transfer Date, and effective as of such Servicing Transfer Date, Purchaser hereby agrees to assume; and shall be deemed to have assumed, all such obligations, and the Seller shall have no obligations with respect thereto.

Plaintiff takes the position that because the improper servicing occurred prior to the servicing transfer date, this provision makes RTC liable for the shortfall between the Certificate Principal Amounts and the underlying mortgage loans.

Defendant, on the other hand, contends that this provision merely governs the date on which servicing obligations would pass from RTC to OnBank, and does not constitute a warranty by RTC that the loans would have been properly serviced prior to that date. Defendant contends that the Agreement expressly limits RTC's warranties and representations to those contained in Article IV, which states that RTC did not make any representations other than those "contained herein." Nowhere, defendant points out, does Article IV state that the loans were or would be properly serviced. To read section 2.3 as an additional warranty, defendant asserts, would put that section in conflict with Article IV.

I am not convinced from this single, ambiguous statement that pre-PSLRA Second Circuit case law dealing with motive, opportunity, or recklessness in a securities fraud context is no longer valid. Simply because Congress did not *codify* that case law by making those factors an express part of the pleading standard does not mean that Congress intended to overturn that case law. As long as the court applies the statute as written, allegations of motive, opportunity, or reckless behavior may still be relevant. *See* S.Rep. No. 104–98, at 15 (1995) ("The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive").

OnBank responds that the timing of the transfer of the servicing rights and obligations is dealt with in section 3.1, which deals with the "servicing transfer date." In contrast, defendant states, section 2.3 expressly refers to RTC being *"liable"* for servicing obligations. As to the effect of Article IV, OnBank notes that in section 5.11, the Agreement states that RTC's liability is limited to liability arising out of the warranties and representations contained in Article IV, and "as provided in Section 2.3 . . ."

▮▮▮ When considering the construction of a contract, the court "should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990) (quoting *William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927)). Only where the language at issue is unambiguous may the court construe it as a matter of law. *Id.; Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 148–49 (2d Cir.1993); *Mycak v. Honeywell, Inc.*, 953 F.2d 798, 802 (2d Cir.1992); *American Home Assur. Co. v. Baltimore Gas & Elec. Co.*, 845 F.2d 48, 50–51 (2d Cir.1988). Whether an ambiguity exists in a contract is a question of law to be resolved by the Court. *Brass*, 987 F.2d at 149; *Curry Rd. Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir.1990); *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987); *Van Wagner Advertising Corp. v. S. & M. Enters.*, 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756 (1986).

▮▮▮ The Second Circuit has made it clear, however, that if the contract is found to be ambiguous, a motion for summary judgment—much less a motion to dismiss—on a breach of contract claim is improper. *See Curry Road Ltd.*, 893 F.2d at 512; *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). "[T]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." *Martin Marietta Corp. v. International Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir.1992); *see also Lip-*

*sky v. Com. United Corp.*, 551 F.2d 887, 897 (2d Cir.1976) (reversing district court's decision to grant motion to dismiss where contract term ambiguous); *Farley v. Davis*, No. 91 CIV. 5530, 1992 WL 110753 (S.D.N.Y. 1992) (denying motion for summary judgment on ground that contract clause was ambiguous).

▮▮▮ A term is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996) (quoting *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). Plain language does not become ambiguous simply by virtue of the parties' differing interpretations. *See Hunt*, 889 F.2d at 1277.

> An ambiguous term, on the other hand, is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Curry Road, Ltd.*, 893 F.2d at 511 (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968)); *see also Care Travel Co. v. Pan American World Airways*, 944 F.2d 983, 988 (2d Cir. 1991). Therefore, "[s]ummary judgment as to the meaning of a contract term may not be granted when the term's meaning is not clear or is reasonably susceptible to more than one interpretation." *Record Club of America, Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1270 (2d Cir.1989).

In the case at bar, I find that the Agreement is ambiguous with regard to RTC's liability for servicing obligations. Simply put, it cannot be said that "there is no reasonable basis for a difference of opinion" concerning the meaning of the statement in section 2.3 that RTC "shall be liable for all Servicing Obligations" prior to the transfer

date. *Nowak,* 81 F.3d at 1192. It is true that this provision does not state that RTC warranted that the loans had been, and would continue to be, properly serviced. By the same token, however, it does not state merely that servicing obligations would pass from RTC to OnBank at the time of transfer. The use of the word "liable" creates an ambiguity that is not susceptible of resolution on a motion to dismiss.

In addition, Article IV, upon which RTC relies, states that RTC made no representations other than those "contained herein." That, too, is ambiguous. The phrase "contained herein" may refer, as RTC contends, only to the representations contained in Article IV. It could also refer, however, to the representations contained in the Agreement.

In short, RTC's interpretation of these provisions is not unreasonable, but neither is it the only reasonable construction of the Agreement. Since these clauses are ambiguous, the court cannot decide their meaning as a matter of law on a motion to dismiss.

## CONCLUSION

Defendant's motion to dismiss the complaint (Item 15) is denied.

IT IS SO ORDERED.