**DIMON INCORPORATED,**
**et ano., Plaintiffs,**

v.

**FOLIUM, INC., et al., Defendants.**

**No. 98 Civ. 6732(LAK).**

United States District Court,
S.D. New York.

May 3, 1999.

Robert Brooks, Robert Merhige, Richmond, VA, Benjamin V. Madison, III, Norfolk, VA, Jack Wilson, III, Richmond, VA, Robert M. Tata, Norfolk, VA, Benita Ellen, Hunton & Williams, Richmond, VA, for Plaintiff.

Charles W. Gerdts, III, Orrick, Herrington & Sutcliffe LLP, New York City, for Defendant Folium, Inc.

James E. Tolan, Catherine A. Duke, Dechert Price & Rhodes, New York City, for Defendant Blair Investments (Private) Ltd.

Matthew Gluck, Mara Leventhal, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Defendants Anthony, Charles and Paul Taberer.

John C. Canoni, Whitman Breed Abbott & Morgan LLP, New York City, for Tabacalera S.A.

### MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff DIMON Incorporated ("DIMON") and a wholly owned subsidiary purchased all of the stock of Intabex Holdings Worldwide, S.A. ("Intabex") and the assets of Tabex (Private) Limited, now Blair Investments (Private) Limited ("Tabex") in April 1997 for a total of $264,190,000. DIMON now alleges it was fraudulently induced to overpay for the acquisition and brings this action against the sellers for breach of contract, fraud, negligent misrepresentation, civil conspiracy, breach of duty of loyalty and breach of warranty. Defendants in various permutations move to dismiss many of the claims.

*Background*

In the fall of 1996, the shareholders of Intabex, a leaf tobacco merchant, began efforts to sell their stock in combination

with the tobacco assets of Tabex.[1] Intabex then was owned 63.6 percent by Folium, Inc. ("Folium"), 31.8 percent by Tabacalera S.A. ("Tabacalera"), and 4.6 percent by Leaf Management Investments Ltd. ("LMI"). Tabex was a wholly owned subsidiary of Folium.[2] Folium allegedly is an investment vehicle for the benefit and control of Anthony, Charles and Paul Taberer,[3] who allegedly controlled Intabex and Tabex through Folium.[4] LMI allegedly held shares of Intabex on behalf of key management within Intabex.[5] Tabacalera, according to the complaint, was an outside investor with no relationship to the Taberers external to Intabex.

In their pursuit of an acquirer, Intabex and Tabex hired the New York investment banking firm, CS First Boston, and provided it with financial information that was used in the preparation of an offering memorandum that was made available to potential buyers.[6] Upon learning that Intabex was on the market, DIMON, an international leaf tobacco merchant based in Danville, Virginia,[7] began negotiations to acquire Intabex and the tobacco related assets of Tabex.[8] Thus commenced a sequence of meetings and conversations, lasting from October 1996 through the closing of the deal in April 1997, and involving numerous representatives of DIMON, Intabex, Folium, Tabacalera, Tabex, and Anthony and Paul Taberer.[9]

The negotiations culminated in a series of agreements: (1) the Stock Purchase Agreement ("SPA") among DIMON and the shareholders of Intabex, (2) the Asset Purchase Agreement ("APA") between Dibrell Brothers Zimbabwe (Private) Limited ("Dibrell"), a wholly owned subsidiary of DIMON, and Tabex, and (3) the Coordinating Agreement ("CA") between and among DIMON, Dibrell, Intabex, Folium, LMI, Tabex and Tabacalera.[10] Pursuant to those agreements, DIMON and Dibrell purchased all of the stock of Intabex and the assets of Tabex in April 1997, respectively, for a total of $264,190,000. The purchase price was paid in the form of 1.7 million shares of DIMON common stock, $140 million in 10–year, 6.25% DIMON convertible subordinated debentures, and $86,120,000 in cash.

The complaint asserts that DIMON and Dibrell were tricked into paying more than the stock and assets were worth because the financial statements provided to them did not accurately reflect the financial performance of Intabex. Specifically, DIMON alleges, *inter alia*, that the Taberers—through their control of Folium and its control of Intabex—operated a carefully masked accounting scheme which led to the overstatement of Intabex's earnings and net worth.

The most critical aspect of the alleged fraud was that certain expenses of Intabex S.A. ZUG ("Intabex S.A."), Intabex's primary trading company[11], were debited during the fiscal years 1995–96 and 1996–97 to a so-called "Blank Account" instead of to the appropriate expense accounts,[12] thus artificially inflating income and net worth.[13] The complaint alleges that Intabex's income for the year ended March 31, 1996 and its net worth at that date consequently were overstated by $22.7 million

1. Sec. Am. Cpt. ¶ 24.

2. *Id.* ¶¶ 33, 53.

3. *Id.* ¶ 37–39.

4. *Id.* ¶ 39, 53.

5. *Id.* ¶ 52.

6. *Id.* ¶¶ 25, 28, 144.

7. *Id.* ¶¶ 3, 20.

8. *Id.* ¶ 24.

9. *Id.* ¶¶ 161, 166, 173, 174, 178, 182, 185.

10. *Id.* ¶ 61; *see* Brooks Decl. in Support of Prelim. Inj. Exs. A(SPA), B(APA), C(CA).

11. Sec. Am. Cpt. ¶ 87.

12. *Id.* ¶ 95.

13. *Id.* ¶ 106.

and $58.7 million, respectively.[14] The operation of this Blank Account, according to DIMON, was that it was carefully concealed and discovered only with great effort after the closing of the acquisition.

At the outset of this action, DIMON and Dibrell sought damages of more than $110 million for alleged breaches of the SPA and APA, violation of Section 10(b) of the Securities Exchange Act of 1934[15] and Rule 10b–5 thereunder,[16] violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"),[17] common law fraud, negligent misrepresentation, and breach of fiduciary duty. Subject matter jurisdiction was alleged to rest on diversity of citizenship and the federal questions presented by the RICO claim. Defendants moved to dismiss the complaint.

In response to the motions to dismiss, Dibrell took a voluntary dismissal, and DIMON dropped its federal securities law and RICO claims. DIMON filed a second amended complaint which contains six causes of action, with jurisdiction premised exclusively on alienage.[18] With the agreement of the parties, the motions to dismiss the earlier pleadings have been deemed applicable to the second amended complaint, and the parties were given an opportunity to brief any new issues raised by that pleading. At this point, Tabex and the Taberers seek dismissal of the entire action as to them. Folium and LMI concede the sufficiency of the indemnification and injunctive relief claims, but seek dismissal of the common law tort claims. The motions now are ripe for decision.

### Discussion

#### Subject Matter Jurisdiction

DIMON is a citizen of Virginia. Dibrell and all of the defendants are aliens.[19] Tabex and the Taberer defendants initially maintained that the three causes of action arising under federal statutes were insufficient as a matter of law and that the rest of the case therefore should have been dismissed for lack of subject matter jurisdiction, as the presence of aliens on both sides destroys complete diversity.

■ The presence or absence of jurisdiction under 28 U.S.C. § 1332 ordinarily is assessed as of the filing of the complaint. Nevertheless, the rule is not without exceptions, and federal courts have the power to permit the addition or deletion of parties where necessary to preserve jurisdiction.[20] Leave is freely granted. Indeed, the failure to grant leave absent prejudice to the remaining defendants is an abuse of discretion.[21]

■ Here, defendants have failed to show any prejudice from the dropping of Dibrell as a plaintiff. In consequence, while the better course would have been for plaintiffs to move pursuant to Rule 21 to drop Dibrell,[22] the Court treats Dibrell's

---

14. *Id.*

15. 15 U.S.C. § 78j(b).

16. 17 C.F.R. § 240.10b–5.

17. 18 U.S.C. § 1961 *et seq.*

18. *See* 28 U.S.C. § 1332(a)(2).

19. Dibrell is incorporated, and has its principal place of business, in Zimbabwe, Am. Cpt. ¶ 5; Folium and LMI are incorporated, and have their principal places of business, in the British Virgin Islands, Sec. Am. Cpt. ¶¶ 4, 6; Tabacalera is incorporated, and has its principal place of business, in the Kingdom of Spain, *id.* ¶ 5; Tabex is incorporated, and has

its principal place of business, in Zimbabwe, *id.* ¶ 7; Anthony C.B. Taberer resides in South Africa, *id.* ¶ 8; Paul A.B. Taberer resides in the United Kingdom, *id.* ¶ 9; and Charles M.B. Taberer resides in Zimbabwe, *id.* ¶·10.

20. *E.g., Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989); *Cooper v. Parsky,* 140 F.3d 433, 442 (2d Cir.1998).

21. *E.g., Samaha v. Presbyterian Hospital in the City of New York,* 757 F.2d 529, 531 (2d Cir.1985).

22. *See Sheldon v. PHH Corp.,* No. 96 Civ. 1666(LAK), 1997 WL 91280, at *3 & nn. 6–7

notice of dismissal pursuant to Rule 41 as such an application and grants the motion.

The dismissal of Dibrell leaves DIMON as the only remaining plaintiff. As DIMON's citizenship is diverse from that of all of the defendants, subject matter jurisdiction exists with respect to all of DIMON's claims.

*Personal Jurisdiction*

Tabex and the Taberers question the existence of personal jurisdiction over them. While DIMON ultimately will bear the burden of establishing *in personam* jurisdiction, its only obligation at this pleading stage is to demonstrate a *prima facie* case.[23] This it has done.

■ First, Tabex has consented to suit here. The CA, in which Tabex irrevocably consented to suit in this Court "for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby," recites that its objects include coordinating "the performance of the Stock Purchase Agreement and the Asset Purchase Agreement and to provide for certain additional obligations of Tabex . . ."[24] While Tabex asserts in entirely conclusory fashion that the claims against it "do not relate to, or arise out of, the" CA,[25] its argument elides the critical words from the CA clause submitting to jurisdiction. Tabex submitted to jurisdiction in this Court not only with respect to claims relating to or arising out of the CA, but also with respect to claims relating to or arising out of "the transactions contemplated" by the CA.[26] DIMON's purchase of the shares of Intabex

undeniably was one of the transactions contemplated by the CA.

■ Second, N.Y. CPLR § 302(a), subd. 1, provides in substance that there is personal jurisdiction under New York law with respect to claims arising out of the transaction of business in New York, directly or through an agent, by a non-domiciliary.[27] Here, DIMON alleges that the Taberers, through Intabex and Tabex, retained a New York firm, CS First Boston, to market this deal, that the offering memorandum by which the transaction was promoted contained the Taberers' recommendation that the acquirer of Intabex acquire also the assets of Tabex, that important preparations and primary negotiations occurred here, that Anthony and Paul Taberer personally participated in negotiations in New York in their respective corporate capacities and in their own behalf, and that these activities ultimately resulted, among other things, in Anthony Taberer being elected to the DIMON board and Paul and Charles Taberer receiving management positions with DIMON.[28]

In these circumstances, DIMON manifestly has alleged that Tabex and the Taberers have transacted business in New York.[29] And the question whether the claims arise out of this transaction of business here is not troublesome. The dispositive question is whether there is "some articulable nexus between the business

(S.D.N.Y. Mar. 4, 1997), *aff'd*, 135 F.3d 848 (2d Cir.1998).

**23.** *E.g., Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 239–40 (2d Cir.1999).

**24.** CA at 1.

**25.** Blair Mem. 12. In light of the fact that each party now has submitted each motion paper in duplicate, the Court refers to the initial filings simply as "Mem.," and the supplemental filings as "Supp. Mem."

**26.** *See* CA at 1.

**27.** N.Y. CPLR § 302(a)(1) (McKinney 1990).

**28.** Sec. Am. Cpt. ¶¶ 25, 28–32, 147, 166–72.

**29.** *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 198–99, 522 N.E.2d 40 (1988) (CPLR 302(a)(1) "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction ... so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.").

transacted and the cause of action sued upon .... " [30]

The essence of the tort claims asserted here against Tabex and the Taberers is that they were culpable participants in a scheme to defraud DIMON in the sale of Intabex shares—a transaction which involved extensive activities, including negotiations, in New York. In particular, DIMON claims that Tabex and the Taberers conspired with others in the effort to misrepresent. or at the very least negligently misrepresented, the financial condition of Intabex and its relationship with Tabex, inducing DIMON to consummate the sale.

"A cause of action can be said to arise from transaction of business in New York when ... the New York business discussions were essential to the birth of the contract and fiduciary relationship that [allegedly] have ... been breached." [31] DIMON alleges that was the case here. Plaintiff thus has articulated the requisite connection between its tort claims and the business defendants transacted in New York to ground this Court with personal jurisdiction over these claims. Whether it can prove this at trial remains to be seen, but the allegations are sufficient at this stage of the case.

*The Alleged Release*

█ Folium, LMI and Tabacalera contend that DIMON's entire case "is premised on the assertion that DIMON was induced to pay more for Intabex than Intabex was really worth" and that its case therefore is barred by a 1997 release given in connection with a purchase price adjustment under the SPA. [32]

The SPA provided in substance that the purchase price set forth in the agreement would be reduced in the event the final net worth of Intabex was less than $142 mil-

lion, as adjusted, and set out a procedure pursuant to which a proposed balance sheet would be tendered to DIMON, an opportunity for objections afforded, and any dispute resolved. [33] A proposed balance sheet was prepared, DIMON voiced objections, and the parties resolved the dispute by entering into an agreement dated as of August 14, 1997 and denominated Agreement and Amendment No. 1 to Stock Purchase Agreement (the "SPA Amendment"). The SPA Amendment provided for the payment by Folium, LMI and Tabacalera to DIMON of $18,850,000 as well as other consideration. It provided also that "[t]he parties intend and agree that this Agreement shall constitute a full and final settlement with respect to Section 1.05 of the [SPA] regarding payments in respect of the Final Net Worth of [Intabex] and each party waives any and all rights to seek a further adjustment to the Purchase Price based on the Final Net Worth of" Intabex. [34] It went on to state that "[n]o claim may be asserted under Article XII of the [SPA] or otherwise by DIMON based on factual allegations made by DIMON to support its proposed net worth adjustments" with certain exceptions not here relevant. [35] It is this agreement upon which Folium, LMI and Tabacalera rest their position. There are, however, a number of problems with this contention.

Defendants' argument depends in significant part upon the false premise that the outcome of the purchase price adjustment mechanism, whether by compromise or by determination of a contested matter, was, or was intended to be, a determination of "what Intabex was really worth." The purchase price here was a negotiated fig-

---

**30.** *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757 (2d Cir.1983) (quoting *McGowan v. Smith,* 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981)).

**31.** *National Cathode Corp. v. Mexus Co.,* 855 F.Supp. 644, 647 (S.D.N.Y.1994) (quoting *Nee v. HHM Fin. Serv., Inc.,* 661 F.Supp. 1180, 1185 (S.D.N.Y.1987)).

**32.** Folium Mem. 23.

**33.** SPA §§ 1.05, 9.01(a).

**34.** SPA Amend. § 7.01(a).

**35.** *Id.* §§ 7.01(b), 7.01(c).

ure which may or may not have been a function of the accounting book value. While the purchase price was subject to a reduction in the event the accounting book value turned out to be less than a specific amount, the fact that the parties reached an agreement as to the accounting book value thus may have only a tangential bearing on whether DIMON overpaid for the shares of Intabex by reason of the alleged breaches of warranty and fraud. Certainly it cannot be said at this stage that the agreement they reached necessarily forecloses DIMON's present claim. And this conclusion is borne out by the language of the release. The parties agreed only that the SPA Amendment "shall constitute a full and final settlement with respect to Section 1.05 of the [SPA] regarding payments in respect of the Final Net Worth of" Intabex—not that it settled any and all claims relating to the acquisition.

This result is supported also by another line of analysis. While it is well settled that a general release ordinarily bars even claims of which the releasor was unaware when the release was executed,[36] the rule is inapplicable in cases of fraud or where the releasee "is silent after becoming aware that the releasor is acting upon a mistaken belief as to a material fact."[37]

Here the release was limited, not general, and its language did not clearly release claims (a) of which the releasor was unaware, or (b) arising from matters other than the historical book value of the company. Indeed, the second amended complaint clearly relies upon alleged fraud as to a number of matters other than net worth, including the quite different issue of profitability.[38] Moreover, to the extent that the second amended complaint relies on misrepresentations as to net worth, it alleges fraud. And although it does not in terms allege that the balance sheet that was tendered following the closing as part of the purchase price adjustment determination was fraudulent, it does allege that the "Blank Account" and other irregularities first were discovered in 1998 and that most of the defendants intentionally misrepresented the financial condition of Intabex to induce DIMON to accept the settlement of the purchase price adjustment.[39] Hence, the plaintiff at least implicitly asserts that the final financial statements tendered on behalf of the defendants were fraudulent as well.[40]

In all the circumstances, the situation is too murky to permit dismissal on the basis of the release at this stage of the proceedings.

---

**36.** *E.g., Pickwick Comm., Inc. v. Weinberg,* No. 91 Civ. 1642(AGS), 1994 WL 620950 (S.D.N.Y. Nov. 8, 1994); *Barrett v. United States,* 622 F.Supp. 574, 584 (S.D.N.Y.1985), *aff'd,* 798 F.2d 565 (2d Cir.1986); *Lucio v. Curran,* 2 N.Y.2d 157, 161–62, 157 N.Y.S.2d 948, 952, 139 N.E.2d 133 (1956); *Mergler v. Crystal Prop. Assoc. Ltd.,* 179 A.D.2d 177, 583 N.Y.S.2d 229 (1st Dept.1992); *G.S.C. Holding Corp. v. Cervoni,* 69 A.D.2d 809, 810, 415 N.Y.S.2d 57, 58 (2d Dept.), *leave to appeal denied,* 47 N.Y.2d 710, 419 N.Y.S.2d 1026, 393 N.E.2d 1049 (1979); *St. James Church, City of Brooklyn, Rector, Church Wardens & Vestrymen Of v. City of New York,* 261 A.D. 614, 617, 26 N.Y.S.2d 762, 764 (2d Dept. 1941).

**37.** *Barrett,* 622 F.Supp. at 584; *see also Mangini v. McClurg,* 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 513, 249 N.E.2d 386 (1969) (inapplicable where fraud alleged); *G.S.C.*

*Holding Corp.,* 69 A.D.2d at 810, 415 N.Y.S.2d at 58 (same).

**38.** *E.g.,* Sec. Am. Cpt. ¶¶ 144–154.

**39.** *Id.* ¶¶ 82–118, 221.

**40.** The Court notes that the financial statements on the basis of which the purchase price adjustment were to be determined were to be prepared as of the closing date. SPA §§ 1.05, 9.01(a) (definitions of Final Financial Statements and Closing Date). In view of the allegation that Tabex transferred $37 million in cash to Intabex and that Intabex wrote off a payable of $6.5 million owed to Tabex after the closing in order to eliminate the debit balance in the blank account (Sec.Am. Cpt.¶ 114), the clear suggestion is that the balance sheet as of the Closing Date, and hence the final financial statements, overstated the net worth of Intabex as of that date.

*Fraud and Negligent Misrepresentation*

*Tabex*

To begin with, the common law fraud claims brought against Tabex as a principal are insufficient. Tabex is not alleged to have made any material misrepresentations or omissions with regard to Intabex. DIMON merely alleges that the offering memorandum prepared by CS First Boston stated that it "was prepared 'from materials supplied to CS First Boston by Intabex Holdings Worldwide S.A. . . . and Tabex.'"[41] But this is not enough. Representations regarding Tabex's financial condition are irrelevant in light of Dibrell's voluntary dismissal. And apart from the conspiracy theory set forth in the civil conspiracy claim, DIMON has advanced no basis for holding Tabex responsible for the alleged fraud or negligent misrepresentation with respect to Intabex. Accordingly, DIMON's fraud and negligent misrepresentation claims must be dismissed insofar as they are brought against Tabex.[42]

*Reasonable Reliance*

Folium, LMI and the Taberers seek dismissal of DIMON's claims for fraud and negligent misrepresentation on the ground that reasonable reliance is an element of both of these claims and that DIMON cannot establish it.

Section 3.13 of the SPA recited that DIMON had conducted its own review of Intabex. It went on to provide in pertinent part that:

"In entering into this Agreement, [DIMON] has relied solely upon its own investigation and analysis and the representations and warranties contained herein, and [DIMON]

"(a) except as otherwise set forth in this Agreement, acknowledges that none of [Intabex], its Subsidiaries, the Share-

holders [Folium, LMI and Tabacalera] or any of their respective directors, offices, employees, Affiliates, agents or representatives makes any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to [DIMON] or its agents or representatives prior to the execution of this Agreement; and

\*     \*     \*     \*     \*     \*

"(c) agrees, to the fullest extent permitted by law, that none of [Intabex], its Subsidiaries, the Shareholders or any of their respective directors, officers, employees, Affiliates, agents or representatives shall have any liability or responsibility whatsoever to [DIMON] on any basis (including, without limitation, in contract or tort . . . ) based upon any information provided or made available, or statements made, to [Intabex] prior to the execution of this Agreement, except that the foregoing limitations shall not apply to [Intabex] or any Shareholder to the extent [Intabex] or such Shareholder makes the specific representations and warranties set forth in this Agreement and in the Disclosure Schedule, but always subject to the limitations and restrictions contained in this Agreement and in the Disclosure Schedule."

In other words, all of those covered by Section 3.13 are protected from liability except to the extent that an individual or entity made specific representations set forth in the SPA. The Taberers allegedly controlled Folium and Tabex, and Folium allegedly controlled Intabex,[43] so the Taberers are Affiliates of Intabex and thus within Section 3.13 as well.[44]

DIMON essentially acknowledges that its disclaimer of reliance on any represen-

41. Sec. Am. Cpt. ¶ 146.

42. DIMON fails also to allege sufficiently the requisite special relationship between it and Tabex to support the negligent misrepresentation claim. *See Silva Run Worldwide Ltd. v.*

*Gaming Lottery Corp.,* No. 96 CIV. 3231(RPP), 1998 WL 167330, \*11 (S.D.N.Y.1998).

43. Sec. Am. Cpt. ¶¶ 33–34, 53.

44. SPA § 9.01(a), at 33.

tations other than those made in the SPA forecloses its fraud and negligent misrepresentation claims relating to events prior to the execution of the SPA under *Danann Realty Corp. v. Harris*[45] and *Harsco Corp. v. Segui*[46] unless it can bring itself within some exception to the *Danann–Harsco* rule.[47] It argues, however, that its claim is sufficient on the theory that "even a specific disclaimer will not undermine another party's allegation of reasonable reliance" if the allegedly misrepresented facts "are peculiarly within the misrepresenting party's knowledge."[48]

The peculiar knowledge exception to the *Danann–Harsco* doctrine holds that "even where the parties have executed a specific disclaimer of reliance on a seller's representations, a purchaser may not be precluded from claiming reliance on any . . . misrepresentations if the facts allegedly misrepresented are peculiarly within the seller's knowledge . . . ."[49] It finds its theoretical basis in the premise that " '[w]hen matters are . . . peculiarly within the defendant's knowledge, . . . plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth.' "[50] And the inquiry as to whether the defendant has peculiar knowledge of the facts at issue, of course, goes to the reasonableness of the plaintiff's reli-

ance[51]—if the plaintiff has the means of learning the facts *and* disclaims reliance on the defendant's representations, there simply is no reason to relieve it of the consequences of both its failure to protect itself and its bargain to absolve the defendant of responsibility. On the other hand, if the plaintiff has conducted the appropriate due diligence and reasonably believes that it has corroborated the defendant's representations, then a different result may be warranted.

The New York cases recognize that the peculiar knowledge exception applies not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty.[52] As the peculiar knowledge inquiry addresses the reasonableness of a plaintiff's claimed reliance, this makes a good deal of sense; the effort necessary to discover the truth bears on the reasonableness of a plaintiff's reliance on a defendant's statements.[53] And the factors relevant to this inquiry include the buyer's (1) level of sophistication and (2) access to the information underlying the alleged misrepre-

---

**45.** 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

**46.** 91 F.3d 337 (2d Cir.1996).

**47.** It does not contend that the disclaimer is insufficiently specific to come within *Danann*.

**48.** Pl. Mem. 14 (quoting *Warner Theatre Assoc. Ltd. Partnership v. Metropolitan Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir.1998)).

**49.** *Tahini Investments, Ltd. v. Bobrowsky*, 99 A.D.2d 489, 470 N.Y.S.2d 431, 433 (2d Dept. 1984).

**50.** *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir.), *cert. denied,* — U.S. ——, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997) (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980)); *see also Tahini*, 99 A.D.2d at 490, 470 N.Y.S.2d at 432–33.

**51.** *See Lazard*, 108 F.3d at 1541.

**52.** *See, e.g., Tahini*, 99 A.D.2d 489, 470 N.Y.S.2d at 432–33 (reliance arguably justified where plaintiff had no practical way of knowing that purchased land had been used as industrial waste dump); *Todd v. Pearl Woods, Inc.*, 20 A.D.2d 911, 248 N.Y.S.2d 975, 977 (2d Dept.1964), *aff'd,* 15 N.Y.2d 817, 257 N.Y.S.2d 937, 205 N.E.2d 861 (1965) (facts discoverable by review of public records held peculiarly within defendant's knowledge), *aff'd,* 15 N.Y.2d 817, 257 N.Y.S.2d 937, 205 N.E.2d 861. 15 N.Y.2d 817, 257 N.Y.S.2d 937, 205 N.E.2d 861 (1965). *See also Lazard*, 108 F.3d at 1542 & n. 9.

**53.** *See Warner Theatre Assoc.*, 149 F.3d 134 (citing *Yurish v. Sportini*, 123 A.D.2d 760, 507 N.Y.S.2d 234, 235 (2d Dept.1986)).

sentation.[54] While not articulating it in these terms, the case law intimates the need for inquiring into these matters.[55]

■ This case involves extremely sophisticated parties. DIMON had or had access to the resources and specialized skills necessary to conduct a quite thorough review of the financial records of Intabex and Tabex. Both sides were represented by able counsel who carefully crafted an extraordinarily detailed agreement in which the disclaimer in Section 3.13 obviously reflected bargained-for language agreed to by parties of comparable bargaining power as opposed to boilerplate imposed by a clearly dominant party upon a much weaker one.

It appears also that DIMON had complete access to the books and records of Intabex and Tabex prior to entering into the controlling agreements or, at least, could have declined to go forward with the transactions if such access had been denied. In consequence, it seems reasonable to assume that a sufficiently intensive review prior to the signing of the agreements would have revealed that which was discovered later. But the fundamental question is whether the difficulty of conducting a sufficiently intensive review, given the information otherwise available, was so great that reliance upon the defendants' representations was reasonable notwithstanding the disclaimer.

At first blush, DIMON's sophistication and the theoretical discoverability of the alleged fraud prior to the closing militate strongly in favor of holding that any reliance by DIMON on any oral or written representations by the defendants was unjustified as a matter of law.[56] But it must be borne in mind that this is a motion to dismiss, not even a motion for summary judgment. The test here is whether it now can be said with certainty that plaintiff could prove no facts under this pleading that would permit a recovery.[57] And it is not clear that that is the case.

The complaint details the manner in which the chief irregularity complained of was discovered after the transaction closed. Under Article XII of the SPA, DIMON was entitled to indemnification from Folium, Tabacalera and LMI through

**54.** *See Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729 (2d Cir. 1984) (justifiable reliance rejected in light of unfettered access to information and buyer's sophistication to make use of that access).

**55.** In general, the more sophisticated the buyer, the less accessible must be the information to be considered within the seller's peculiar knowledge. *See, e.g., Jackson v. State,* 210 A.D. 115, 205 N.Y.S. 658 (4th Dept.1924) (although a sophisticated buyer, access was limited); *Tahini Investments,* 99 A.D.2d 489, 470 N.Y.S.2d 431 (a triable issue of fact whether buyer could have ascertained that industrial waste drums were buried on the property bought); *Yurish,* 123 A.D.2d 760, 507 N.Y.S.2d 234 (gross receipts of delicatessen business in the peculiar knowledge of sellers where buyer alleged it had "virtually no way of confirming" seller's representations); *Todd,* 20 A.D.2d 911, 248 N.Y.S.2d 975 (reliance justified notwithstanding that information ascertainable in public records); *OnBank & Trust Co. v. F.D.I.C.,* 967 F.Supp. 81, 86 (W.D.N.Y.1997) (although a sophisticated buyer, a question of fact whether information was made available during due diligence and whether the loan irregularities would have been detected anyway); *Patell Indus. Mach. Co., Inc. v. Toyoda Machinery U.S.A., Inc.,* 880 F.Supp. 96, 98 (N.D.N.Y. 1995) (a question of fact whether in peculiar knowledge where substantial cost to fly out to inspect machinery and inspection might not have disclosed problem); *Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.,* 785 F.Supp. 411 (S.D.N.Y. 1992) (information not in seller's peculiar knowledge where plaintiff had access to the information and would have been able to discover the alleged misrepresentations with ordinary due diligence).

**56.** Section 3.13 does not preclude reliance as against Intabex and the selling shareholders (Folium, LMI and Tabacalera) on the representations by each of them, respectively, made in the SPA. But the fraud and negligent misrepresentations claims against the defendants on those counts do not seek recovery for misrepresentations *by them* in the SPA.

**57.** *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

September 30, 1998 for losses resulting from breaches of the representations and warranties in the SPA.[58] Following the closing, DIMON embarked on an intensive search for such breaches. During that period, DIMON found that the accounting system of Intabex S.A. allowed entries to be "audited-off." That is, the transaction detail for entries so treated no longer was available for review in the general ledger or in the account analysis. Moreover, the audited-off entries were stored in a data file that was virtually inaccessible without special access codes.[59]

To understand the purpose and effect of the "audited off entries," DIMON required accounting personnel to review journal entries and other source documents and to reconstruct accounting entries.[60] It then contacted the software consultant who had serviced the Intabex S.A. accounting system, and the consultant ultimately was able to restore the entries for certain periods through a complicated computer process.[61] The restoration of the general ledger in turn led to the discovery of the so-called Blank Account and to the fact that there had been substantial activity in the account despite the fact that it previously reflected no beginning balance and no activity.[62] The activity had been concealed by crediting the Blank Account at the end of each fiscal year in aggregate amounts sufficient to eliminate the debit balance created by charging expenses to that account and recording fictitious debits to supplier payable accounts or customer advance accounts.[63] Shortly after the end of each fiscal year, after the outside auditors had completed their work, the Blank Account was "revived" by reversing the March 31 transactions.[64]

One would expect that the discovery of such a fraud shortly after the closing, if not earlier, would have been inevitable, notwithstanding the measures detailed above, because the large debit balance carried in the Blank Account presumably would have made it impossible to reconcile the reported balance sheet with the general ledger accounts.[65] But the complaint details the manner in which this allegedly was avoided. According to DIMON, the Taberers shortly before the closing eliminated the balance in the Blank Account by fraudulently generating accounts receivable from parties related to them.[66] These fraudulent receivables then were "paid" at or about the time of the closing.[67] And while these payments eliminated the net worth deficiency that had been created by the defendants' activities, they allegedly were insufficient to avoid the damage complained of because DIMON already had been induced by false and misleading financial statements to pay more for Intabex than it otherwise would have.[68]

In the last analysis this Court must decide if the allegations of the complaint, construed in the light most favorable to DIMON, permit the conclusion that the alleged accounting scheme detailed above was within the peculiar knowledge of the Intabex shareholders. That is, taking into consideration DIMON's level of sophistica-

---

58. Sec. Am. Cpt. ¶ 73, 74. The SPA provided that any losses or liabilities would be set off against $90 million of the convertible debentures. *Id.* ¶¶ 75, 82.

59. *Id.* ¶ 89.

60. *Id.* ¶ 90.

61. *Id.* ¶ 91.

62. *Id.* ¶¶ 92, 94.

63. *Id.* ¶ 96.

64. *Id.* ¶ 98.

65. *See id.* ¶ 109.

66. *Id.* ¶ 110.

67. *Id.* ¶¶ 111–14.

68. *Id.* ¶ 114.

The principal claim appears to be that the payment of the fraudulent receivables cured the balance sheet shortfall but did not undo the misleading impression as to the profitability of Intabex created by the earlier fraudulent income statements.

tion and access to the financial records of Intabex, might a trier of fact be permitted to find that it was reasonable for DIMON not to discover the alleged Blank Account fraud?

Defendants argue that *Lazard Freres & Co. v. Protective Life Insurance Co.*[69] dictates a negative answer to that question. In *Lazard,* an insurance company agreed to purchase $10 million of bank debt from a New York investment bank.[70] The representative for the buyer orally agreed to the transaction while on vacation after an eleven minute telephone conversation with the seller during which the seller described the contents of a report concerning the securities, a report the buyer never had seen, and told the buyer that it would have to act right away, before the report became public, in order to buy at an advantageous price.[71] The Circuit assumed that the buyer was bound upon its oral commitment and, in consequence, that the pivotal report then was within the peculiar knowledge of the seller.[72] It nevertheless held, in light of the buyer's sophistication, that the buyer's failure to protect itself by insisting that its examination of the report be made a condition of its obligation to close rendered its reliance unjustified as a matter of law[73] noting that:

> "[w]here, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have

willingly assumed the business risk that the facts may not be as represented."[74]

*Lazard* does not go nearly as far as the defendants contend. Although DIMON, like the buyer in *Lazard,* was sophisticated and had a duty to protect itself, the cases are not entirely parallel. The buyer in *Lazard* knew that it was going forward on the basis of the seller's summary of an important report, yet failed to protect itself against the possibility that the representations were false. DIMON, however, allegedly thought it had full access to the information underlying the defendants' representations and that the information corroborated them. Its alleged reliance therefore was not knowingly blind, as was that of the buyer in *Lazard.* Moreover, unlike the buyer in *Lazard,* DIMON did seek to protect itself against possible misrepresentations. It bargained for a post-closing adjustment in the event the accounting net worth of Intabex proved to be at variance with the sellers' representations.[75] Moreover, it obtained an indemnity from the Intabex shareholders, secured by $90 million in debentures, "for any misrepresentation, breach of warranty or breach of any covenant or agreement contained in" the SPA.[76]

In the last analysis, the facts here cut both ways. On the one hand, DIMON's sophistication, the language and carefully crafted nature of the disclaimer, and the finely honed contractual remedies for breach of warranties and representations offer substantial support for defendants' contention that DIMON knowingly bargained away some of the protections that otherwise might have been available to it,

**69.** 108 F.3d 1531.

**70.** *Id.* at 1534.

**71.** *Id.*

**72.** *Id.* at 1542.

**73.** *Id.* at 1543.

**74.** *Id.* (citing *Rodas v. Manitaras,* 159 A.D.2d 341, 552 N.Y.S.2d 618, 620 (1st Dept.1990)).

**75.** *See* SPA § 1.05 and Article XII. The Court does not fail to note that the alleged misrepresentations were made by Folium, Tabex and the Taberers, and that DIMON's protection was against misrepresentations made by Intabex. This, however, is of no moment. As discussed *infra,* there was, in fact, little distinction in identity between Intabex, Folium, Tabex and the Taberers.

**76.** *Id.* § 12.04.

that DIMON did not rely on the alleged misrepresentations and, in any case, that it did not do so justifiably. On the other hand, the allegations, if proved, might permit a trier of fact to find that the fraud was so well concealed that the truth must be regarded as having been within the exclusive knowledge of the defendants notwithstanding DIMON's sophistication and access to the Intabex books. Among other things, the complaint suggests the likelihood that Intabex's 1995 and 1996 financial statements had been audited by Ernst & Young,[77] whose apparent failure to detect the scheme lends credence to DIMON's contention that the scheme was so well concealed that DIMON was justified in relying on the information provided to it. Only a more extensive development of the facts will permit a fully informed judgment. As the Court on this record cannot exclude the possibility that plaintiff might prove facts under the current pleading that would entitle it to relief,[78] defendants' motion to dismiss these claims must be denied at this stage.

### Particularity of Fraud Claims

Folium and the Taberer defendants next contest the particularity with which DIMON has pleaded its common law fraud claims. Specifically, they argue that DIMON has not alleged with particularity any connection between the fraudulent ac-

tivity and defendants.[79] The Court disagrees.

Rule 9(b) requires that "the circumstances constituting fraud ... be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." [80] Plaintiffs must provide actual fraudulent statements or conduct and a basis for its allegations of *scienter*.[81] The latter can be accomplished by "(1) alleging facts to show that defendant[ ] had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." [82] Here, DIMON sufficiently alleges fraud against Folium and the Taberers.

DIMON has detailed the alleged fraudulent activity regarding Intabex's manipulation of its accounting system [83] and the dissemination of the fraudulent financial statements via CS First Boston.[84] DIMON alleges also that the Taberers made statements in New York regarding the false financial statements in their capacities as representatives of Folium despite their knowledge of the operation of the Blank Account.[85]

Defendants argue that DIMON has alleged nothing more than that they "must have known of alleged Intabex accounting

---

77. Sec. Am. Cpt. ¶ 25.

78. *See, e.g., Conley,* 355 U.S. at 45–46, 78 S.Ct. 99.

79. Folium contends that "DIMON's pleading still provides no specific basis for its allegations that Folium had a role in the alleged fraudulent conduct or any knowledge that any of Intabex's financial information was incorrect." Folium Supp. Mem. 14.

80. FED. R. CIV. P. 9(b).

81. *E.g., Stevelman v. Alias Research Inc.,* No. 97–9544, 1999 WL 187646, *4 (2d Cir. Apr.5, 1999); *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996) (citations omitted).

82. *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,* 84 F.3d 629, 634 (2d Cir.1996).

83. Sec. Am. Cpt. ¶¶ 73–114.

84. *Id.* ¶¶ 25, 146, 148, 161–65. Defendants argue that they cannot be held responsible for the information in the offering memorandum because of a specific disclaimer of reliance on the first page of the document. This argument fails, at least at this stage, for the reasons discussed above with respect to DIMON's disclaimer of defendants' extra-contractual representations. The Court finds no reason to accord less force to a disclaimer made and signed by DIMON in the SPA than to a disclaimer in CS First Boston's offering memorandum unacknowledged by DIMON.

85. *Id.* ¶¶ 166–172.

irregularities,"[86] even assuming as we must that the foregoing allegations are accepted as true. But this simply is not the case. First, DIMON alleges a nexus between the alleged fraud and these defendants, detailing throughout the second amended complaint Folium's control of Intabex, and the Taberers' control of Folium.[87] According to these allegations, the Taberers, through Folium, directed the accounting practices detailed above.[88] Second, the fraudulent activity alleged here includes the intentional misrepresentation by Folium and the Taberers of "the condition of Intabex Worldwide and its subsidiaries to induce DIMON to purchase the stock of Intabex Worldwide."[89] Third, the Taberers motive to engage in the alleged fraud is palpable. In consequence, DIMON has alleged with adequate particularity that Folium and the Taberers engaged in fraudulent activity.

*Alleged Absence of a Special Relationship*

■ Defendants Folium and the Taberers next move to dismiss DIMON's negligent misrepresentation claim for failure to state a claim. In order to recover on such a claim, a plaintiff must establish that (1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied upon the information given.[90] Defendants, at this stage, do not contest that the information was incorrect and relied upon by plaintiff. The issue is whether a special relationship existed between defendants and DIMON prior to the sale of Intabex.

■ The essential aspects of the requisite special relationship, as Judge Walker wrote not long ago, "may not be precisely defined."[91] "[T]he parties must enjoy a relationship of trust and reliance 'closer ... than that of the ordinary buyer and seller,'"[92] and an "arm's length business relationship is not enough."[93] But little more can be said in the way of articulating a rule of broad application; the matter is one "for case-by-case analysis."[94] Moreover, at least two cases have found sufficient complaints alleging the existence of a special relationship between buyer and seller in corporate acquisitions involving lengthy negotiations.[95]

■ This transaction was more than a simple sale. The parties engaged in lengthy negotiations prior to the acquisition of Intabex in which the defendants allegedly made representations—based on their superior information—regarding Intabex's financial condition.[96] Moreover, as

---

**86.** Folium Supp. Mem. 15.

**87.** Sec. Am. Cpt. ¶¶ 33–51, 56–59, 107–110.

**88.** *Id.* ¶¶ 107–08.

**89.** *Id.* ¶ 220.

**90.** *E.g., Pappas v. Harrow Stores, Inc.,* 140 A.D.2d 501, 504, 528 N.Y.S.2d 404, 407 (2d Dept.1988).

**91.** *Polycast Technology Corp. v. Uniroyal, Inc.,* No. 87 Civ. 3297(JMW), 1988 WL 96586, *10 (S.D.N.Y. Aug.31, 1988).

**92.** *Id.* (citing *Coolite Corp. v. American Cyanamid Co.,* 52 A.D.2d 486, 384 N.Y.S.2d 808, 811 (1st Dept.1976)); *see also American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988) (special relationship required for a negligent misrepresentation claim is one that "suggests a closer degree of trust and reliance than that of the ordinary buyer and seller").

**93.** *United Safety of Am., Inc. v. Consolidated Edison Co.,* 213 A.D.2d 283, 623 N.Y.S.2d 591, 593 (1st Dept.1995).

**94.** *Polycast,* at *10.

**95.** *Id.; Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.,* No. 85 Civ. 3439(JFK), 1988 WL 36330 (S.D.N.Y. Apr.11, 1988).

**96.** *Polycast Technology Corp. v. Uniroyal, Inc.,* No. 87 Civ. 3297(JMW), 1988 WL 96586, at *12 (S.D.N.Y. August 31, 1988) (special relationship existed where extended negotiation period between the parties before purchase of seller's subsidiary, seller vouched for the earnings projections and had superior infor-

part of the purchase price, DIMON issued to the Intabex shareholders $90 million of DIMON convertible subordinated debentures, thus creating at least the possibility of a long-term involvement between the shareholders and DIMON. Paul, Charles and Anthony Taberer received positions of trust within DIMON, thus establishing a continued relationship with DIMON.[97] For all these reasons, the Court cannot exclude at this early stage the possibility that the relationship among the parties was sufficient to impose a duty of due care upon the defendants in making representations about the subjects of the transaction. In consequence, the motion to dismiss the negligent misrepresentation claim is denied.

## Alleged Breach of Fiduciary Duty

The Taberers next argue that DIMON has not stated a claim for breach of fiduciary duty because they owed DIMON no duty at the time of the alleged breach.[98] But DIMON's allegation is not limited to breaches prior to the Taberers' affiliation with DIMON. DIMON alleges that the Taberers breached their fiduciary duties after they became employees of or consultants to DIMON by "failing to reveal to DIMON that the value of Intabex had been overstated and by permitting DIMON to make decisions and filings based on that fraud" even though they were aware of it.[99]

On this record the Court cannot say to a legal certainty that no breach occurred if, in fact, the Taberers withheld knowledge regarding Intabex's accounting system which affected—as plaintiff contends—DIMON's corporate decisions and filings.

## The Conspiracy Claim

Defendants' final contention is that DIMON's civil conspiracy claim must be dismissed for failure to state an underlying tort.

New York does not recognize a claim for conspiracy in the abstract.[100] Nevertheless, "[a]llegations of conspiracy are permitted ... to connect the actions of separate defendants with an otherwise actionable tort."[101] As discussed above, DIMON adequately has pleaded underlying torts against Folium and the Taberers. DIMON alleges also that Tabex conspired and acted in concert with Folium and the Taberers in effectuating those torts. In consequence, this branch of defendants' motion is without merit.

## Conclusion

In sum, the defendants' motions to dismiss are denied in all respects except that Counts II and III of the second amended complaint are dismissed as to defendant Blair Investments (Private) Ltd.

SO ORDERED.

---

mation regarding the subsidiary throughout the negotiation).

**97.** Sec. Am. Cpt. ¶ 235.

**98.** *See* Paul and Charles Taberer were hired by DIMON, and Anthony Taberer received a seat on DIMON's Board of Directors, following DIMON's acquisition of Intabex. Sec. Am. Cpt. ¶¶ 30–32.

**99.** Pl. Supp. Mem. 15; Sec. Am. Cpt. ¶ 236.

**100.** *Alexander & Alexander of New York, Inc. v. Fritzen,* 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 547, 503 N.E.2d 102 (1986) (citations omitted).

**101.** *Id.*