**UNICREDITO ITALIANO SPA, and Bank Polska Kasa Opieki SA, Plaintiffs,**

v.

**JPMORGAN CHASE BANK, J.P. Morgan Chase & Co., J.P. Morgan Securities Inc., Citibank, N.A., Citigroup, Inc., and Salomon Smith Barney Inc., Defendants.**

No. 02Civ.5328(KTS)(JCF).

United States District Court, S.D. New York.

Oct. 14, 2003.

Order Denying Reconsideration Nov. 12, 2003.

tions of wrongdoing based upon undisclosed facts do not state a cause of action.").

Arnold & Porter by Charles G. Berry, Robert A. Goodman, New York City, El-liott Reihner Siedzikowski & Egan PC by Thomas J. Elliot, Mark A. Kearney, John P. Elliott, Thomas N. Sweeney, Blue Bell, PA, for Plaintiffs.

Simpson Thacher & Bartlett by Thomas C. Rice, David J. Woll, John D. Roesser, Caline Mouawad, New York City, Paul, Weiss, Rifkind, Wharton & Garrison by Jonathan Hurwitz, Michael Gertzman, Brad S. Karp, New York City, for Defendants.

*OPINION AND ORDER*

SWAIN, District Judge.

This action concerns loans, made by Plaintiffs to or for the benefit of the Enron Corporation, that were administered by JP Morgan Chase Bank and Citibank. Plaintiffs contend that Defendants defrauded them in connection with the formation of certain syndicated credit facilities and payments under those facilities. The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1332. Defendants now move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure for an order dismissing the Second Amended Complaint. The Court has considered thoroughly all arguments and submissions in connection with the instant motions. For the following reasons, Defendants' motions are granted in part and denied in part.

## BACKGROUND

The following factual recitation is drawn from the Second Amended Complaint (the "Complaint"), statements or documents incorporated in the Complaint by reference, public disclosure documents filed with the SEC, and/or documents that Plaintiffs either possessed or knew about and upon which they relied in bringing this action. *See Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000) (and cases cited therein). All of Plaintiffs' allegations are taken as true for the purposes of this recitation.

Plaintiff UniCredito Italiano SpA ("UCI") is an Italian financial institution with headquarters in Milan, Italy. (Compl.¶ 36.) Plaintiff Bank Polska Kasa Opieki SA, also known as Bank Pekao SA ("Pekao") is a Polish financial institution with headquarters in Warsaw, Poland. (*Id.* ¶ 37.)

Defendant JP Morgan Chase & Co. ("JPMC & Co.") is a Delaware corporation with its principal place of business in New York. Its primary banking subsidiary is Defendant JP Morgan Chase Bank; its primary investment banking or securities subsidiary is Defendant J.P. Morgan Securities Inc. Defendant JP Morgan Chase Bank is a New York corporation, with its principal place of business in New York. Defendant J.P. Morgan Securities Inc. is a Delaware corporation with offices in New York. (*Id.* ¶¶ 38–40.)

Defendant Citigroup, Inc. ("Citigroup") is a Delaware corporation with its principal place of business in New York. Citigroup's primary banking subsidiary is Defendant Citibank, N.A. ("Citibank"); its primary investment banking or securities subsidiary is Defendant Salomon Smith Barney. Citibank is a national banking association with its principal place of business in New York. Defendant Salomon Smith Barney is a New York corporation with its principal

place of business in New York. (*Id.* ¶¶ 41–43.)

### Defendants' Involvement in Enron's Off-Balance–Sheet Partnerships

In 1999 Enron began to enter into business relationships with partnerships, known as the LJM partnerships, in which former Enron CFO Andrew Fastow was both the manager and an investor. (*Id.* ¶ 68.) These Special Purpose Entities ("SPEs") were designed to remove from Enron's balance sheet assets that had lost or were at risk of losing value, in order to give Enron the appearance of a healthier financial condition. (*Id.* ¶ 62.) Defendants were significant participants in transactions entered into by at least one of the LJM partnerships, an entity referred to in the Complaint as LJM2. (*Id.* ¶ 72.) Defendants Citigroup and JPMC & Co., directly or through their affiliates, each invested at least $10 million in transactions with LJM2. (*Id.*)

A feature of many of the SPE transactions was a "trigger point" at which Enron was to issue new shares to the SPEs to cover losses in the value of the assets that had been transferred to the SPEs. (*Id.* ¶ 74.) The SPEs were then to sell the Enron shares issued to them in order to cover partnership losses. (*Id.*) By participating in the SPEs and their sale of Enron shares, Defendants generated profits for themselves and contributed to Enron's collapsing share price. (*Id.*)

The existence of the LJM partnerships was disclosed in Enron's publicly filed financial reports. (*Id.* ¶ 84.) These disclosures did not indicate the nature or extent of Fastow's financial interest in the LJM partnerships. (*Id.*) Defendants knew that Enron's disclosures with respect to the LJM partnerships were materially misleading, inaccurate, and inadequate, and they withheld that knowledge from Plaintiffs. Defendants knew that Plaintiffs re-

lied upon Enron's disclosures in making their decisions to participate in the credit facilities at issue. (*Id.* ¶ 85.)

*Defendants' Involvement in Enron Prepays*

"Prepays" are transactions in the commodities trading business in which parties arrange for the prepayment of commodities to be delivered at a later date. (*Id.* ¶ 86.) Enron used prepay transactions designed by Defendants to disguise loans to Enron. (*Id.* ¶ 87–88, 90.) Prepay transactions were arranged in which the Defendant banks or their affiliates would agree to purchase some commodity and simultaneously to sell it back to Enron. (*Id.* ¶ 90.)

*JP Morgan Chase Bank and the Mahonia Prepays*

Enron conducted a large number of prepay transactions with the participation of Defendant JP Morgan Chase Bank through an offshore SPE called Mahonia, Ltd. JP Morgan Chase Bank paid the Channel Islands law firm of Mourant de Feu & Jeune to set up Mahonia. (*Id.* ¶ 97.) JP Morgan Chase Bank was aware that Enron entered into prepays with Mahonia as a means of disguising Enron's debt and received substantial revenues from Mahonia's dealings with Enron. (*Id.* ¶ 98.) Plaintiff quotes George Serice, a Chase officer working on the Enron account, as having remarked in an email to Jeffrey Dellapina, a Managing Director at JP, Morgan Chase Bank, that "'Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev[enue] or (better yet) bury it in their trading liabilities.'" (*Id.* ¶ 100.) One or more of the JP Morgan Chase defendants created marketing material for the prepay transactions. (*Id.* ¶ 102.) One of those marketing presentations in July 1998 noted that prepays were "'balance sheet "friendly."'" (*Id.*)

In an action brought by JP Morgan Chase Bank against certain insurance companies to enforce surety bonds related to Mahonia, the defendants have asserted that they were improperly induced to provide security for what were in effect loans. In a June 2002 filing in that action, JP Morgan Chase Bank admitted that "'the surety bonds were part of financing transactions in which the funds advanced by JP Morgan Chase to Mahonia were ultimately used by Enron for general corporate purposes, not to secure future sources of the oil and gas to be delivered.'" (*Id.* ¶ 105.)

*Citigroup Defendants and the Delta and Roosevelt Prepays*

Defendants Citibank and Salomon Smith Barney, with the approval of Citigroup, set up a trust called Yosemite, which transferred funds to a Citigroup-controlled SPE named Delta. (*Id.* ¶ 108.) Delta used funds from Yosemite to engage in purported prepays with Enron in which no commodities actually changed hands and Citigroup and the Yosemite investors received the equivalent of interest payments from Enron. (*Id.*)

The Citigroup Defendants also assisted Enron in keeping $125 million in bank loans off its books in a purported prepay known as the Roosevelt transaction. (*Id.* ¶ 113.) In late 1998. Citigroup or its representative agreed to transfer $500 million to Enron for six months as part of on oil and gas prepay. (*Id.* ¶ 114.) In April 1999, Enron asked Citigroup to extend its time to repay a substantial portion of Citigroup's founds. (*Id.*) Citigroup agreed to extend the date for Enron to make oil deliveries worth $125 million and through a secret oral agreement gave Enron until September 20, 1999 to repay that amount. (*Id.*) As indicated in an internal email dated April 27, 1999 from senior Citigroup loan executive James F. Reilly, "'the pa-

perwork'" could not reflect the extension "'as that would require recategorizing the prepaid as simple debt.'" (*Id.* ¶ 115.)

### The Credit Facilities

The bulk of Plaintiffs' damages claims in this action arise from losses sustained on investments in credit facilities for Enron for which the Defendant banks served as Administrative and/or Paying Agents or, in the case of JP Morgan Chase Bank with respect to a 2001 letter of credit facility, the Issuing Bank, and which were marketed by the Defendant securities subsidiaries. Defendants JP Morgan Chase Bank (through its predecessor in interest, The Chase Manhattan Bank) and Citibank were the Co–Administrative Agents for three Enron credit facilities in which Plaintiffs participated: 1) a $1.25 billion medium-term credit facility entered into on May 18, 2000 (the "2000 Credit Facility"), 2) a $1.75 billion short-term facility entered into on May 14, 2001 (the "2001 Credit Facility"), and 3) a $500 million letter of credit facility entered into on May 14, 2001 (the "2001 L/C Facility) (collectively, the "Syndicated Facilities"). (*Id.* ¶ 118.) Citibank was also the Paying Agent for the 2000 and 2001 Credit Facilities, and The Chase Manhattan Bank was the Paying Agent and Issuing Bank for the 2001 L/C Facility. *See* 2000 Credit Facility Agreement, Ex. A to Gertzman Decl.; 2001 Credit Facility Agreement, Ex. B to Gertzman Decl.; 2001 L/C Facility Agreement, Ex. C to Gertzman Decl.

The agreements establishing each of the Syndicated Facilities contained disclaimer, covenant, and acknowledgment provisions identical in all relevant respects to the following provisions of the 2000 Credit Facility:

Section 7.02 *Paying Agent's Reliance, Etc.*

[T]he Paying Agent shall not have, by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Bank or the holder of any Note; and nothing in this Agreement or any other Loan Document, expressed or implied, is intended or shall be so construed as to impose upon the Paying Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein. Without limitation of the generality of the foregoing, the Paying Agent ... (iii) makes no warranty or representation to any Bank for any statements, warranties or representations (whether written or oral) made in or in connection with any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document or any other instrument or document furnished pursuant hereto or in connection herewith on the part of the Borrower or to inspect the property (including the books and records) of the Borrower;

Section 7.03 *Paying Agent and Its Affiliates*

With respect to its Commitment, the Advances made by it and the Note issued to it, each Bank which is also the Paying Agent shall have the same rights and powers under the Loan Documents as any other Bank and may exercise the same as though it were not the Paying Agent; the term "Bank" or "Banks" shall, unless otherwise expressly indicated, include any Bank serving as the Paying Agent in its individual capacity. Any Bank serving as the Paying Agent and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and general-

ly engage in any kind of business with, the Borrower, any of the Subsidiaries and any Person who may do business with or own securities of the Borrower or any Subsidiary, all as if such Bank were not the Paying Agent and without any duty to account therefor to the Banks.

Section 7.04 *Bank Credit Decision*

Each Bank acknowledges that it has, independently and without reliance upon the Paying Agent or any other Bank and based on the financial statements referred to in Section 4.01(d) and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Bank also acknowledges that it will, independently and without reliance upon the Paying Agent or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents. The Paying Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Bank or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Advances or at any time or times thereafter.

2000 Credit Facility Agreement §§ 7.02–7.04, Ex. A to Gertzman Decl., at 31–32. Sections 8.02 to 8.04 of the 2000 Credit Facility Agreement are identical in all relevant respects to Sections 7.02 to 7.04 with the substitution of the term "Co–Administrative Agents" for the term "Paying Agent." *See* 2000 Credit Facility Agreement §§ 8.02–8.04, Ex. A to Gertzman Decl., at 34–35. For parallel provisions in the agreements for the other credit facili-

ties, *see* 2001 Credit Facility Agreement §§ 7.02–7.04, 8.02–8.04, Ex. B to Gertzman Decl. at 31–32, 34–35; and 2001 L/C Facility Agreement §§ 7.02–7.04, 8.02–8.04, Ex. C to Gertzman Decl. at 30–31, 33–34.

As noted above, JP Morgan Chase Bank was also designated as the "Issuing Bank" under the 2001 L/C Facility Agreement, which provided that the "Issuing Bank," in selling to the participating banks their pro rata share of the obligation under any letter of credit issued pursuant to the agreement, "represents and warrants to [the participating bank] that the Issuing Bank is the legal and beneficial owner of such interest being sold by it, free and clear of any liens, but makes no other representation or warranty. The Issuing Bank shall have no responsibility or liability to any other [participating bank] with respect to any [letter of credit obligation] or any such participation[.]" (2001 L/C Facility Agreement § 2.03(c), Ex. C to Gertzman Decl. at 10.) Section 7.03 of the 2001 L/C Facility Agreement provided that the Issuing Bank and its affiliates had the right to engage in transactions with Enron "with no duty to account therefor" to the participating banks, and section 7.04 contains the acknowledgment of participating banks that they had not relied on the Issuing Bank in making the decision to enter into the agreement and that they would make their continuing decisions as to whether or not to take action under the agreement or letters of credit issued under the agreement "independently and without reliance upon ... the Issuing Bank[.]" (*Id.* §§ 7.03–7.04, Ex. C to Gertzman Decl. at 31.)

In each of the agreements for the Syndicated Facilities, Enron (which was referred to in the agreements as the "Borrower") entered into certain covenants concerning the participating banks' due diligence rights. These covenants were

identical in all relevant respects to the covenants in the 2000 Credit Facility Agreement, the pertinent provisions of which follow:

Section 5.01 *Affirmative Covenants.*

(a) Reporting Requirements [the Borrower will furnish to each Bank:]

(viii) such other information respecting the condition or operations, financial or otherwise, of the Borrower or any of its Subsidiaries as any Bank through the Paying Agent may from time to time reasonably request.

. . . . .

(f) *Visitation Rights* At any reasonable time and from time to time, after reasonable notice, [the Borrower will] permit the Paying Agent or any of the Banks or any agents or representatives thereof, to examine the records and books of account of, and visit the properties of, the Borrower and any of its Principal Subsidiaries, and to discuss the affairs, finances and accounts of the Borrower and any of its Principal Subsidiaries with any of their respective officers or directors.

2000 Credit Facility Agreement §§ 5.01(a)(viii), (f), Ex. A to Gertzman Decl. at 26–27. For parallel covenants in the agreements for the other credit facilities, *see* 2001 Credit Facility Agreement §§ 5.01(a)(viii), (f), Ex. B to Gertzman Decl. at 26–27; 2001 L/C Facility Agreement §§ 5.01(a)(viii), (f), Ex. C to Gertzman Decl. at 26–27.

Defendants Salomon Smith Barney and J.P. Morgan Securities (the "Securities Subsidiaries") were co-lead arrangers of the Syndicated Facilities. (Compl.¶ 119.) They distributed to participant banks offering memoranda and invitations to offer in connection with the Syndicated Facilities. Those documents contained and referred to publicly filed financial informa-

tion about Enron. (*Id.*) The offering memoranda contained the following section entitled "Disclaimer":

The information contained in this Information Memorandum has been supplied by or on behalf of Enron Corp. (the "Company"). Neither Salomon Smith Barney Inc. and Chase Securities Inc. (as "Co–Lead Arrangers") nor any of their affiliates · has independently verified such information and the same is being provided by the Co–Lead Arrangers for informational purposes only. The Co–Lead Arrangers do not make any representation or warranty as to the accuracy or completeness of such information and does not [sic] assume any undertaking to supplement such information as further information becomes available or in light of changing circumstances. The Co–Lead Arrangers shall not have any liability for any representations or warranties (express or implied) contained in, or any omissions from, the Information Memorandum or any other written or oral communication transmitted to the recipient in the course of its evaluation of the proposed financing or otherwise.

The information contained herein has been prepared to assist interested parties in making their own evaluation of the proposed financing for the Company and for no other purpose. The information does not purport to be all-inclusive or to contain all information that a prospective lender may desire. It is understood that each recipient of this Information Memorandum will perform its own independent investigation and analysis of the proposed financing and the creditworthiness of the Company, based on such information as it deems relevant and without reliance on Co–Lead Arrangers. The information contained herein is not a substitute for the recipient's independent investigation and analysis.

*See* 2000 Credit Facility Information Memorandum, Ex. D to Gertzman Decl. (no pagination); 2001 Credit and L/C Facilities Invitation to Offer, Ex. E to Gertzman Decl., at viii.

Plaintiff UCI contributed $10,416,667.67 under the 2000 Credit Facility, $11,666,666.67 under the 2001 Credit Facility, and $3,333,333.33 under the 2001 L/C Facility. (Compl.¶ 120.) Plaintiff Pekao purchased a participating interest in the 2000 Credit Facility in the amount of $6.25 million. (*Id.*)

In determining whether to extend credit under the Facilities, Plaintiffs conducted credit assessments that included, *inter alia*, a review of Enron's financial statements, including its 10–K and 10–Q Forms filed with the SEC. (*Id.* ¶ 122.)

If Plaintiffs had known the true facts of Enron's financial condition, especially its actual amount of debt and its actual debt-to-capitalization ratio, and the extent of the improper transactions conducted by Enron with Defendants and others, Plaintiffs would not have participated in the Facilities. (*Id.* ¶ 124.)

Defendants withheld information from Plaintiffs concerning Enron's debt, its inflated revenues, and Defendants' role in improper transactions that allowed Enron to fraudulently manipulate its publicly reported financial condition. (*Id.* ¶ 127.)

Under the agreements for the Syndicated Credit Facilities, Enron represented that it was in compliance with applicable laws, that there had been no adverse change in its financial condition since the end of its prior fiscal year, and that it had and would maintain a ratio of total senior debt to total capitalization of no more than 65%. (*Id.* ¶ 128.) Defendants knew that Enron's debt-to-capitalization ratio was higher than reported. (*Id.* ¶ 129.) A 1999 internal Citibank document revealed that Citibank was aware that Enron had a debt-to-capitalization ratio of over 65%. (*Id.*) Defendants also knew that Enron was in violation of securities and commodities laws. (*Id.* ¶ 130.)

The Defendant banks and securities subsidiaries through, *inter alia*, the offering memoranda and invitations to offer, directed Plaintiffs to public information regarding Enron's financial information that they knew to be materially false. (*Id.* ¶ 133.)

*The October 25, 2001 Borrowing Requests*

Under the credit agreements governing the 2000 and 2001 Credit Facilities, Enron had to satisfy certain conditions before it could receive loan funds, including compliance with all laws and the maintenance of a 65% debt-to-capitalization ratio. (*Id.* ¶ 138.) On October 25, 2001, Plaintiff UCI received borrowing demands at 11:48 a.m. and 12 noon, conveyed through Citibank, for immediate payment of its shares of the 2000 and 2001 Credit Facilities, and Plaintiff Pekao received a demand at 12 noon, conveyed through Citibank, to fund immediately its share of the 2000 Credit Facility. (*Id.* ¶ 139.)

At 2:45 p.m., the Managing Director of JP Morgan Chase Securities, Claire O'Connor, notified UCI that Enron would explain its need for cash to redeem its commercial paper at a conference call at 3:00 p.m. (*Id.* ¶ 140.) The Defendant banks helped manage Enron's commercial paper program, but O'Connor did not mention their role. (*Id.* ¶¶ 140–41.) O'Connor falsely stated that Enron was drawing down the funds to reestablish market confidence. (*Id.* ¶ 141.) At the 3:00 p.m. conference call, Enron's CFO explained that Enron needed the full amounts of the 2000 and 2001 Credit Facilities so that Enron could redeem its commercial paper. (*Id.* ¶ 142.) The Defendant banks participated in the conference call, but said noth-

ing about Enron's defaults under the credit agreements, defaults of which they were aware. (*Id.* ¶ 143.)

At 4:06 p.m., UCI received a facsimile from Citibank conveying Enron's certification that its representations and warranties, including those in the credit agreements, continued to be correct, and that there was no default or event of default under the credit agreements. (*Id.* ¶ 144.) UCI and Pekao subsequently forwarded their respective contributions under the credit facilities to Citibank, to be conveyed to Enron. (*Id.* ¶ 145.)

Pursuant to section 6.01 of the credit agreements governing the 2000 and 2001 Credit Facilities, if a majority of the participating banks had determined that a default or event of default had occurred that relieved them of their obligations under the agreements, the banks could have instructed Citibank to declare the termination of each bank's obligation to make advances. (*Id.* ¶ 148.) Defendants knew that Enron's debt-to-capitalization ratio put it in breach of the credit agreements, and their concealment of that breach prevented Plaintiffs from exercising their rights under section 6.01. (*Id.* ¶ 147.)

The Defendant banks, who were also participants in the 2000 and 2001 Credit Facilities, contributed their shares of the October 25, 2001 funding. (*Id.* ¶ 149.) The credit facilities enabled the banks to reduce their aggregate exposure and take a "smaller hit" with respect to Enron. (*Id.*)

On November 1, 2001, the Defendant banks announced that they were negotiating to extend $1 billion in secured loans to Enron. Citibank conditioned its participation in that secured loan on Enron's payment of an earlier $250 million unsecured Citibank loan. (*Id.* ¶ 152.)

### UCI and the 2001 L/C Facility

After its October 25, 2001 payments, UCI sought from JP Morgan Chase Bank the identification of all letters of credit that had been issued under the 2001 L/C Facility and information as to the current status of those letters of credit. (*Id.* ¶ 154.) On November 26, 2001, JP Morgan Chase Bank identified eleven letters of credit that it said had been issued under the 2001 L/C Facility, two of which had expired. (*Id.* ¶ 155.) On Friday, November 30, 2001, UCI received a request to fund $1,050,000 under a letter of credit for Enron, and made the requested payment to JP Morgan Chase Bank. (*Id.* ¶ 156.)

Enron filed for bankruptcy protection on Sunday, December 2, 2001. (*Id.* ¶ 157.) On December 3, 2001, UCI received a different list from JP Morgan Chase of letters of credit purportedly issued under the 2001 L/C Facility. The second list included a $150 million letter of credit dated October 9, 2001 in favor of an entity called Mahonia. (*Id.* ¶ 158.) The Mahonia letter of credit was drawn down on December 11, 2001. (*Id.* ¶ 159.)

Under the agreement governing the 2001 L/C Facility, Enron's breach of its covenants, representations, and warranties would have permitted a majority of the participating banks in that facility to demand security from Enron, including requiring Enron to deposit an amount equal to the undrawn letter of credit amounts into a cash collateral account. (*Id.* ¶ 163.)

Defendant JP Morgan Chase Bank has continued to demand payments from UCI under the 2001 L/C Facility, including a demand in May 2002. (*Id.* ¶ 165.) Plaintiff has refused to make any further payments under the 2001 L/C Facility. (*Id.*) On June 4, 2002, JP Morgan Chase Bank advised UCI and other participating banks that JP Morgan Chase Bank had erroneously applied letters of credit in an aggre-

gate amount exceeding the maximum authorized under that facility. (*Id.* ¶ 166.) UCI was advised that it would be paid its proportionate share of such excess. To date, no such payment has been made. (*Id.*)

UCI has made repeated requests of JP Morgan Chase Bank for information, to which UCI is entitled to as a participant in the 2001 L/C Facility and which JP Morgan Chase Bank has made available to other participating banks, about the letters of credit that have been issued under that Facility; those requests have been refused. (*Id.* ¶¶ 167, 260.) JP Morgan Chase Bank has failed to allow UCI to have access to a repository or central file of documents relating to the 2001 L/C Facility, including documents that UCI has specifically requested. (*Id.* ¶ 168.)

JP Morgan Chase Bank has submitted and continues to submit bills for legal expenses to UCI that JP Morgan Chase Bank claims are subject to indemnification under the 2001 L/C Facility. (*Id.* ¶ 169.)

### The 2000 L/C Facility

In May 2000, the same month UCI approved its participation in the 2000 Credit Facility, it also, under a separate agreement with Enron, approved a $10 million letter of credit facility for Enron, which was increased to $30 million in August 2000 (the "2000 L/C Facility"). (*Id.* ¶ 121.) UCI would not have taken part in the 2000 L/C Facility had it not been for Defendants' participation in falsifying Enron's financial statements, including its Form 10–K and 10–Q, specifically the disclosures concerning revenues, earning, liabilities, and debt. (*Id.* ¶ 170.) Defendants knew that UCI had established the 2000 L/C Facility, but they did not advise UCI of Enron's actual financial condition. (*Id.* ¶ 172.)

On August 31, 2000, at the direction of Enron, UCI issued a standby letter of credit in favor of CalPX Trading Services in the amount of $10 million. On December 12, 2000, that amount was increased to $25 million at the direction of Enron. (*Id.* ¶ 174.) The maturity date was extended several times at Enron's request, including by an agreement on October 24, 2001, to extend the maturity date to November 30, 2001. (*Id.* ¶ 175.) After the October extension, UCI and Enron began negotiations concerning Enron providing collateral for the letters of credit that UCI had issued. By the third week of November 2001, Enron had delivered to UCI a form of agreement under which Enron was to provide the collateral. (*Id.* ¶ 176.)

On or about November 26, 2001, UCI received a phone call from Claire O'Connor. O'Connor asked UCI if it would be interested in contributing its $25 million exposure on the 2000 L/C Facility to a new letter of credit facility for the benefit of Enron that JP Morgan Chase Bank was proposing to arrange. (*Id.* ¶ 177.) UCI declined to participate, and explained that it expected to enter an agreement under which it would receive cash collateral from Enron for its 2000 L/C Facility exposure. (*Id.*)

UCI and Enron never executed the proposed agreement for collateral. On November 30, 2001, the letter of credit was drawn down in the full amount of $25 million. (*Id.* ¶¶ 179–80.)

### PROCEDURAL HISTORY

UCI commenced this action in the District of Delaware on February 7, 2002, and filed an Amended Complaint on or about March 19, 2002, adding Bank Pekao as a plaintiff. On April 15, 2002, Defendants moved to dismiss the action pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure or, in the alternative, to transfer the action to this District.

On June 26, 2002, the Delaware court granted Defendants' motions to transfer. *See Unicredito Italiano v. JPMorgan Chase Bank,* No. 02–104, 2002 WL 1378226 (D.Del. June 26, 2002). On November 1, 2002, Plaintiffs filed the Second Amended Complaint.

## DISCUSSION

In evaluating a motion to dismiss a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court is obliged to take as true the facts as alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). The action must not be dismissed unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Ganino v. Citizens Utilities Company,* 228 F.3d 154, 161 (2d Cir.2000). The Court may consider statements or documents incorporated in the Complaint by reference, public disclosure documents filed with the SEC, and documents "that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000) (internal citations omitted).

### Choice of Law

The credit agreements for the Syndicated Facilities provide that they are governed by New York law. *See* 2000 and 2001 Credit Facilities § 9.07; 2001 L/C Facility § 10.07. Furthermore, the parties have presumed in their arguments that New York law governs this action. *See Tehran–Berkeley Civil Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989) ("implied consent to use a forum's law is sufficient to establish choice of law"). Accordingly, the Court will apply New York law in rendering its decision.

### Plaintiffs' Causes of Action

Plaintiffs UCI and Pekao assert common law claims against all Defendants for fraudulent concealment (Count I), fraudulent inducement (Count II), aiding and abetting fraud by Enron (Count III), negligent misrepresentation (Count IV), civil conspiracy (Count V), and unjust enrichment (Count VII). Plaintiffs assert a claim against JP Morgan Chase Bank and Citibank for breach of an implied duty of good faith in connection with the Syndicated Facilities (Count VI). Plaintiff UCI also seeks declaratory relief against Defendant JP Morgan Chase Bank with respect to the 2001 L/C Facility (Count VIII).

### Plaintiffs' Fraud and Negligent Misrepresentation Claims

The elements of a claim for fraud or fraudulent inducement under New York law are (1) that defendant made a material false representation, (2) with the intent to defraud the plaintiff, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of that reliance. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995) (*"Banque Arabe"*). Fraudulent concealment claims have the additional element that the defendant had a duty to disclose the material information. *Id.* A duty to disclose arises where 1) one party has superior knowledge of certain information; 2) that information is not readily available to the other party; and 3) the first party knows that the second party is acting on the basis of mistaken knowledge. *Banque Arabe,* 57 F.3d at 155.

Negligent misrepresentation claims under New York law have the following elements: (1) the defendant had a

duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir.2000). In transactions between sophisticated financial institutions, "no extra-contractual duty of disclosure exists," *Banque Arabe* at 158, although determination of reasonable reliance also depends on whether the person making the representation held or appeared to hold unique or special expertise, and whether the speaker knew the use to which the representation would be applied and made the representation for that purpose. *See Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir.2001).

■ Plaintiffs' fraud and misrepresentation claims must be dismissed because the contracts pursuant to which they made their Enron loan investments preclude them from establishing essential elements of those claims, namely, that the Defendant banks had a duty to disclose information regarding or gained from their business dealings with Enron, and that any reliance by Plaintiffs on misrepresentations by the Defendants was reasonable. *See Banque Arabe*, 57 F.3d at 155 (agreement with specific disclaimer "operate[d] as a waiver absolving [defendant] of responsibility to make affirmative disclosures concerning ... financial risks"); *DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 319 (S.D.N.Y.2002) (plaintiff's particularized disclaimers "make it impossible for it to prove one of the elements of a claim of fraud: that it reasonably relied on the

representations it alleges were made to induce it to enter into the [agreement]").

Sections 7.02 and 8.02 of the 2000 Credit Facility and parallel provisions of the other operative documents provided specifically that the Defendant banks, in their capacities as Paying or Co–Administrative Agents, would have no obligations other than those expressly specified in the relevant agreements and that they had no duty "to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document or any other [relevant] instrument or document ... on the part of Borrower." Sections 7.03 and 8.03 of that agreement and the parallel provisions of the other relevant operative documents permitted the Defendant banks, in their capacities as Paying or Co–Administrative Agent or, with respect to JP Morgan Chase Bank in connection with the 2001 L/C Facility, as Issuing Bank, and their affiliates to engage in banking and other business transactions with Enron and its affiliates, "without any duty to account therefor to the [lending] Banks." Under section 7.04 and 8.04, the lenders agreed that the bank Defendants, in their capacities as Paying or Co–Administrative Agent, would "not have any duty or responsibility, either initially or on a continuing basis, to provide any [lending] Bank or the holder of any Note with any credit or other information with respect thereto, whether coming into [their] possession before the making of the [loan] Advances or at any time or times thereafter." Section 2.03(c) of the 2001 L/C Facility Agreement further provided that, in connection with any purchase by a bank of a participation in a letter of credit issued under the facility, "the Issuing Bank represents and warrants ... that the Issuing Bank is the legal and beneficial owner of such interest being sold by it ... but makes no other representation or warranty. The Issuing

Bank shall have no responsibility or liability to any other [participating bank] with respect to any [letter of credit obligation]."

■ Plaintiffs' fraudulent concealment and negligent misrepresentation claims as against Defendant banks thus must fail because, even if the bank Defendants had the knowledge the Complaint attributes to them, the banks had no duty to disclose it to Plaintiffs. Sophisticated parties such as Plaintiffs are held to the terms of their contracts. *See, e.g., Harsco Corp. v. Segui,* 91 F.3d 337, 346 (2d Cir.1996).

The operative documents also, on their face, preclude Plaintiffs from claiming that they relied reasonably on any alleged representations by the Defendants. In addition to the above-quoted provisions disclaiming any duties on the banks' part to monitor Enron's compliance with its obligations in connection with the loan facilities and permitting the banks and their affiliates to carry on business transactions with Enron and its affiliates without accounting to the other lenders for that activity, the lenders specifically agreed that they had, and would continue to, make their own credit decisions and would not rely on the Defendant banks, either in entering into the facilities or in making decisions in the course of the performance of the relevant agreements. *See* 2000 Credit Facility § 7.04 and parallel provisions of other operative documents. Having failed to bargain for the right to rely on the banks as monitors of Enron's compliance with its disclosure, financial condition and other covenants, or for the right to benefit from any knowledge gained by the Defendant banks or their affiliates in connection with their own business dealings with Enron and its affiliates, Plaintiffs cannot, as a matter of law, be held reasonably to have relied on any misrepresentations or omissions by the Defendants concerning those matters. *Cf. Lazard Freres*

*& Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1541 (2d Cir.1997) ("It is well established that '[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.' "); *Dyn-Corp,* 215 F.Supp.2d at 322 ("Sophisticated parties to major transactions cannot avoid their disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or more complete warranties.").

Counts I, II and IV of the Complaint will therefore be dismissed for failure to state a claim.

■ Plaintiffs' invocation of the doctrine of "peculiar knowledge" does not compel a different result. Under this doctrine, express waivers or disclaimers of reliance will not be given effect "where the facts are peculiarly within the knowledge of the party invoking [them]." *Banque Arabe,* 57 F.3d at 155 (internal quotation marks omitted). The "peculiar knowledge" doctrine relates to the reasonableness of claims of reliance, finding

> its theoretical basis in the premise that "'[w]hen matters are ... peculiarly within the defendant's knowledge, ... plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth.'" ... And the inquiry as to whether the defendant has peculiar knowledge of the facts at issue, of course, goes to the reasonableness of the plaintiff's reliance ...— if the plaintiff has the means of learning the facts *and* disclaims reliance on the defendant's representations, there simply is no reason to relieve it of the consequences of both its failure to protect itself and its bargain to absolve the defendant of responsibility. On the other hand, if the plaintiff has conducted

the appropriate due diligence and reasonably believes that it has corroborated the defendant's representations, then a different result may be warranted.

*Dimon Inc. v. Folium, Inc.*, 48 F.Supp.2d 359, 368 (S.D.N.Y.1999) (citations and footnotes omitted). Plaintiffs contend that the "peculiar knowledge" exception applies in the instant case because Defendants were involved in the off-balance sheet partnerships and prepay transactions that enabled Enron to disguise its actual financial condition. Plaintiffs rely heavily in this regard on *Dimon, supra*. The *Dimon* plaintiff, an "extremely sophisticated" party that had purchased the stock of a company from the defendant in that case, alleged that the purchase price had been inflated artificially through a complicated accounting scheme that had effected the concealment of certain expenses. *Id.* at 361–363. The purchase agreement disclaimed the plaintiff's reliance on any representations other than those expressly included therein; those representations apparently did not include ones as to the accuracy of the information at issue. Although the agreement provided plaintiff with extensive access to company information, the concealed information was only uncovered after the closing, through complicated reconstruction of the general ledger. *Id.* at 369–370. The court in that case refused to grant a motion to dismiss the plaintiff's fraud claims on the basis of the contractual disclaimer, recognizing that the "peculiar knowledge" doctrine, as developed in New York, applies not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, although only with extraordinary effort or great difficulty, and holding that dismissal pursuant to Rule 12(b)(6) was inappropriate because the plaintiff's allegations, "if proved, might permit a trier of fact to conclude that the fraud was so well concealed that the truth must be regarded as having been within the exclusive knowledge of defendants notwithstanding [plaintiff's] sophistication and access to the [company's] books." Relevant in this regard was the reported failure of the purchased company's auditors to detect the scheme. *Id.* at 368, 372.

Like *Dimon*, all of the other peculiar knowledge cases cited by Plaintiffs involved alleged concealment or misrepresentation of material information by counterparties in the transactions at issue. *See Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir.1993) (nondisclosure by seller of stock warrants); *Buy This, Inc. v. MCI Worldcom Communications, Inc.*, 209 F.Supp.2d 334 (S.D.N.Y. 2002) (nondisclosure by purchaser of long-distance telephone minutes); *OnBank & Trust Co. v. FDIC*, 967 F.Supp. 81 (S.D.N.Y.1997) (failure to disclose by seller of mortgage pass-through certificates and servicing rights); *Doehla v. Wathne Limited, Inc.*, No. 98 Civ. 6087, 1999 WL 566311 (S.D.N.Y. Aug. 3, 1999) (misrepresentation and concealment by defendant owners of employer corporations in employment negotiations with plaintiff); *Aniero Concrete Company, Inc. v. New York City Construction Authority*, Nos. 94 Civ. 9111, 95 Civ. 3506, 1997 WL 3268 (S.D.N.Y. Jan. 3, 1997) (misrepresentations by defendant assignor and its agent relating to agreement assigning rights under construction contract to plaintiff assignee); *Stambovsky v. Ackley*, 169 A.D.2d 254, 572 N.Y.S.2d 672 (1st Dept.1991) (nondisclosure by seller of house).

Information as to the true nature of Enron's financial condition plainly was not the exclusive province of the Defendant banks. Enron, for one, certainly possessed such information, and covenanted in the relevant agreements to provide access

to its books and records and to make representations concerning its financial condition. Plaintiffs argue, however, that Enron's alleged deliberate concealment of its true financial condition, including by means of the prepayment and off-balance sheet transactions described above, rendered the truth so difficult to ascertain that the "peculiar knowledge" doctrine could permit a finding of reasonable reliance by Plaintiffs on misrepresentations by the Defendants. Plaintiffs' effort is fatally flawed because they have proffered neither authority nor legal justification for the extension of the peculiar knowledge exception to third parties such as the banks or their affiliates. Plaintiffs' fundamental problem, and the alleged root of their losses, is the allegedly fraudulent conduct of the party on whose representations they agreed to rely, and to which they lent money. Defendants neither borrowed from Plaintiffs nor agreed to provide Plaintiffs, which were themselves sophisticated financial institutions, with any insight into the borrower's status.[1]

Extension of the peculiar knowledge exception to defeat contractual allocations of risks away from the Defendant banks in this case because the principal (Enron) was particularly adept at concealment of its fraud would require at a minimum some factual basis for finding reasonable Plaintiffs' reliance on parties on whom it agreed it would not rely in any respect in making the operative decisions. Plaintiffs have failed to posit any such factual scenario, and the Court declines to extend the peculiar knowledge doctrine, which has developed in the context of fraud by counterparties to transactions, to make third parties guarantors of the integrity of such counterparties. Parties are, of course, free to bargain for such guarantees, but the parties to the transactions at issue here did not do so. Indeed, Plaintiffs here agreed that the Defendant banks and their affiliates could engage in commercial transactions with Enron (and thus have access to special knowledge of Enron's affairs) without any responsibility to account to Plaintiffs for those transactions. *See* 2000 Credit Facility §§ 7.03 and 8.03 and parallel provisions of other operative agreements.

UCI also fails to state a claim for fraud or misrepresentation with respect to the 2000 L/C Facility. The Complaint alleges that UCI "agreed separately" to extend Enron credit under the 2000 L/C Facility, which is described in Plaintiff's opposition memorandum as "a bilateral letter of credit facility that UCI issued directly and not as a part of any syndicate." (Compl. ¶ 170; Pl.'s Mem. at 18.) There is no allegation in the Complaint or anywhere else that any of the Defendants was a signatory to the agreement governing the 2000 L/C Facility or had any involvement

---

1. The structure of the transactions at issue is noteworthy in this regard. Under the 2000 and 2001 Credit Facilities, Plaintiffs' extensions of credit were made through syndicated credit facilities in which multiple banks agreed to extend credit directly to Enron or its designees. Such transactions are different from loan participations, in which one or more banks transfer to other banks portions of their pre-existing loan commitments. *See Banco Espanol de Credito v. Security Pacific National Bank,* 763 F.Supp. 36, 43 n. 5 (S.D.N.Y.1991) ("A [loan] participation, as distinguished from a multibank loan transac-tions (syndicated loan), is an arrangement in which a bank makes a loan to a borrower and then sells all or a portion of that loan to a purchasing bank." (quoting United States Comptroller of the Currency, Banking Circular *181* (1984))). Although the 2001 L/C Facility was apparently structured to include a sale by the Issuing Bank of the letters of credit issued under the facility to the participating banks, the Agreement limits the Issuing Bank's representations and warranties to title to the interest being sold and Enron is responsible under the agreement for all financial information and representations.

or connection with UCI's decisions regarding that agreement. UCI nonetheless asserts that it is entitled to recover from Defendants for fraud or misrepresentation because Defendants knew that UCI "had put in place" the 2000 L/C Facility but failed to disclose information within their possession about Enron's true financial condition and instead "intentionally misled" UCI about Enron's finances. As the Court has explained above, even under the credit agreements to which the Defendant banks were parties the banks had no duty to disclose information about Enron's financial condition, and the disclaimer provisions in those agreements preclude any inference of reasonable reliance by UCI on Defendants with respect to credit decisions relating to those agreements. Consequently, UCI cannot establish that Defendants had a duty to disclose Enron's financial condition or that UCI reasonably relied on Defendants in connection with the 2000 L/C Facility, in which none of the Defendants even participated. Accordingly, the Complaint fails to state a fraud or misrepresentation claim with respect to the 2000 L/C facility, and Counts I, II, and IV are dismissed.

*Plaintiffs' Aiding and Abetting Fraud Claim*

The elements of a claim for aiding and abetting fraud are: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." *Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 94 F.Supp.2d 491, 511 (S.D.N.Y.2000). "Substantial assistance" exists where "(1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *McDaniel v. Bear Stearns & Co., Inc.*, 196 F.Supp.2d 343, 352 (S.D.N.Y.2002).

Plaintiffs have stated a claim for aiding and abetting fraud. Plaintiffs allege that Defendants knowingly participated in and helped structure the transactions–the prepays and the LJM2 transactions–that enabled Enron to distort its public financial statements, specifically with respect to Enron's revenues and its ratio of balance sheet debt to balance sheet capital. Furthermore, Plaintiffs allege that Defendant's participation in those transactions contributed to Enron's collapse, and thus its inability to meet its obligations under the credit agreements. In addition, by identifying Enron's fraudulent statements, that is, the revenue and debt-to-equity figures in Enron's public financial statements, and specifying the way in which those figures misrepresented the reality of Enron's revenues and liabilities, Plaintiffs have plead Enron's fraud with sufficient particularity to satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Accordingly, Defendants' motions are denied to the extent they seek dismissal of Count III.

*Plaintiffs' Claim for Breach of the Implied Duty of Good Faith and UCI's Claim for Declaratory Relief*

The express disclaimers in the credit agreements preclude Plaintiffs' claim for breach of the implied duty of good faith in those agreements to the extent that claim is premised on the allegedly fraudulent conduct addressed above. Plaintiffs allege that the failure of Defendant banks to disclose Enron's true financial condition in connection with the credit transactions prevented Plaintiffs from taking advantage of their various rights under the credit agreements. Although New York law implies a duty of good faith and

fair dealing in every contract, "no obligation can be implied that would be inconsistent with other terms of the contractual relationship." *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 979–980, 663 N.E.2d 289 (1995) (internal quotation marks omitted). Here, as explained above, the operative contracts specifically absolve the Defendant banks from any duty to disclose financial information regarding Enron and contain Plaintiffs' undertakings to rely on their own credit analyses in making the relevant decisions. Implication of a duty, notwithstanding these provisions, of the banks to make disclosures regarding Enron's financial conditions would clearly be inconsistent with the governing contracts. *Cf. Banco Espanol de Credito*, 763 F.Supp. at 44–45 ("courts do not impose an obligation which would be inconsistent with other terms of the contractual relationship and for which the parties did not bargain.... The express disclaimer provisions of the [participation agreement] preclude the common law claims [of breach of an alleged implied covenant of good faith and fair dealing, tortious misrepresentations, and claims of breach of an alleged duty to disclose based on superior knowledge] asserted by the various plaintiffs."). Count VI of the Complaint therefore fails to state a claim upon which relief can be granted to the extent it is premised on the Defendant banks' alleged failure to disclose Enron's true financial condition.

UCI also asserts a separate claim for breach of the implied duty of good faith in the 2001 L/C Facility against Defendant JP Morgan Chase Bank, as well as a claim for declaratory relief based on the same underlying factual allegations.[2] UCI alleges that JP Morgan Chase Bank intentionally and in bad faith submitted and continues to submit for payment letters of credit "that were not validly issued under the 2001 L/C Facility," and claims for its legal expenses that are not subject to indemnification under the 2001 L/C Facility. UCI also alleges that JP Morgan Chase Bank has deprived and continues to deprive UCI of information it has requested regarding the 2001 L/C Facility. To the extent these causes of action are premised on the allegedly fraudulent conduct by JP Morgan Chase Bank under the 2001 L/C Facility discussed above, they fail to state a claim for which relief can be granted for the reasons explained above.

Nevertheless, it is not clear that UCI could prove no set of facts consistent with the allegations in the Complaint that would entitle it to relief on other grounds with respect to the alleged improper issuance of letters of credit, improper expense claims and failure to provide information. To the extent, for instance, UCI seeks to assert a breach of contract claim or other claim for noncompliance with the terms of the 2001 L/C Facility Agreement, no provision in the agreement appears to preclude such a claim as a matter of law. Furthermore, an indemnification provision in the 2001 L/C Facility Agreement under which the participating banks agreed to indemnify the Co–Administrative and Paying Agents and the Issuing Bank from any and all claims or expenses incurred in connection with letters of credit explicitly excludes indemnification for claims or expenses attributable to the gross negligence or the willful misconduct of those parties. *See id.* §§ 7.07, 8.07, 9.01, Ex. C to Gertzman

---

2. UCI seeks a judgment that 1) it has no further obligations under the 2001 L/C Facility, 2) JP Morgan Chase Bank has an obligation to return all funds paid by UCI under the facility, and 3) JP Morgan Chase Bank must grant full access to UCI to any documents or other information made available to any other bank participating in the facility. (Compl. ¶ 263.)

Decl. at 32, 35, 36. Accordingly, Counts VI and VIII will be dismissed for failure to state a claim only to the extent they are premised on allegedly fraudulent conduct by JP Morgan Chase Bank. UCI will, however, be required to amend its Complaint to clarify the nature of any non-fraud based claims intended to be asserted in these Counts.

### Plaintiffs' Unjust Enrichment Claim

 The elements of an unjust enrichment claim under New York law are that "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir.2000). Under New York law, "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract [i.e., unjust enrichment] for events arising out of the same subject matter." *MacDraw, Inc. v. CIT Group Equipment Financing, Inc.*, 157 F.3d 956, 964 (2d Cir.1998). Plaintiffs assert that Defendants "unjustly used the funds Plaintiffs paid under the agreements to reduce the debt Enron owed them.... Taking advantage of their superior knowledge concerning Enron's actual, dire financial condition, they seized the opportunity to flood Enron [with Plaintiff's cash] in order to have their debt paid off." (Pls.' Mem. at 45.) As Plaintiffs acknowledge, the payments in question were made pursuant to the credit agreements. As to the allegation that Defendants took advantage of their "superior knowledge" of Enron's financial condition, the Court has already detailed how the credit agreements expressly provided that Defendant banks and their affiliates had no duty to account to Plaintiffs for their dealings with Enron, and the banks had no duty to provide Plaintiffs with any information in connection with payments under the agreements.

Because the credit agreements govern the subject matter of Plaintiffs' unjust enrichment claim, Count VII fails to state a claim upon which relief can be granted. Accordingly, Count VII is dismissed.

### Plaintiffs' Civil Conspiracy Claim

 The elements of a civil conspiracy are (1) an agreement between two or more persons, (2) an overt act, (3) an intentional participation in the furtherance of a plan or purpose and (4) resulting damage. *Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2002 WL 362794, at *13 (S.D.N.Y. Mar. 6, 2002). New York law does not recognize the substantive tort of civil conspiracy; the claim is available "only if there is evidence of an underlying actionable tort." *Missigman v. USI Northeast, Inc.*, 131 F.Supp.2d 495, 517 (S.D.N.Y.2001). Conspiracy allegations "are permitted only to connect the actions of separate defendants with an otherwise actionable tort." *Alexander & Alexander*, 68 N.Y.2d 968, 510 N.Y.S.2d 546, 547, 503 N.E.2d 102 (1986). As the Court explained in its discussion of Plaintiffs' aiding and abetting claim, Plaintiff has adequately plead fraud by Enron, and has alleged that Defendants knowingly participated in Enron's fraudulent accounting scheme. Accordingly, Plaintiffs' allegations of conspiracy serve to connect Defendants' conduct "with an otherwise actionable tort." and Count V states a claim for which relief can be granted.

### CONCLUSION

Plaintiffs have already plead their claims three times. They filed the Second Amended Complaint after briefing Defendants' motions to dismiss the Amended Complaint. In light of the foregoing analysis and Plaintiffs' multiple prior opportunities to address the legal insufficiencies of

the claims asserted in this action, granting further leave to replead certain of Plaintiffs' claims would be futile. Accordingly, Defendants' motions are granted to the following extent, and denied in all other respects: Counts I, II, IV, and VII of the Second Amended Complaint are dismissed with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Counts VI and VIII are also dismissed with prejudice pursuant to Rule 12(b)(6) to the extent they are premised on misrepresentations or omissions by Defendants concerning Enron's financial condition. Plaintiffs' surviving causes of action are Counts III and V, and VI and VIII to the extent not hereby dismissed. Because the Court has resolved Defendants' motions under Rule 12(b)(6), it is unnecessary for the Court to address Defendants' Rule 9(b) arguments.

Plaintiffs' objection to a July 18, 2003 Order of the MDL Panel conditionally transferring this action to the United States District Court for the Southern District of Texas is now pending. If the MDL Panel does not rescind its transfer order, Plaintiffs shall, within 21 days of the MDL Panel's decision with respect to the objection, serve and file a Third Amended Complaint reflecting the foregoing determinations. That complaint shall included allegations sufficient to make clear the nature of any non-fraud based claims intended to be asserted in Counts VI and VIII.

This case is hereby placed on the Court's suspense docket pending the MDL Panel's decision on Plaintiffs' objection.

SO ORDERED.

### ORDER

Plaintiffs seek reconsideration of the portion of the Court's October 10, 2003, Opinion and Order dismissing certain of Plaintiffs' claims with prejudice or, in the alternative, entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b) as to those claims. For the following reasons, Plaintiffs' motion is denied.

Plaintiffs, although purporting to set forth controlling legal precedents and factual considerations overlooked by the Court, merely reiterate arguments raised in the briefing of Defendants' motions or at oral argument. The Court considered thoroughly those arguments and related submissions in reaching its decision. *P.T. Bank Central Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 754 N.Y.S.2d 245 (1st Dep't 2003), which Plaintiffs contend the Court failed to acknowledge, involved alleged fraud in the sale of a commodity by one party to another, as did the cases analyzed by the Court at pages 24–25 of the October 10, 2003, decision. Specifically, *P.T. Bank* involved the sale by a bank of a loan participation to another bank that was not a party to the original credit agreement. The court's recognition of the potential applicability of the "Special Facts" doctrine in that case, thus, arose not in connection with potential liability of a bank in its role as administrative agent with respect to a loan facility but, rather, in connection with misrepresentations allegedly made in a secondary transaction in which the defendant bank sold the plaintiff a participation in the credit it had previously extended to the defaulting borrower. *Cf.* Opinion at 26 n. 1 (discussing difference in structure between syndicated credit facilities and loan participations). Plaintiffs also quibble with the "counterparty"/ "third party" nomenclature used by the Court to explain the distinction between the peculiar knowledge cases cited by Plaintiffs and the facts presented here, arguing that the Court overlooked facts because the defendants banks were parties to agreements at issue in this case. As the Court's Opinion makes abundantly clear, the Court was well aware that the defen-

dant banks were parties to the credit facility agreements. The term "third party" was used in reference to the absence of a borrower/lender role on the part of those entities with respect to the credit relationship at issue here, *i.e.,* Plaintiffs' agreement to extend credit to Enron and/or its affiliates.

Plaintiffs further assert that the Court overlooked the various indemnification provisions of the relevant agreements, which exclude protection for gross negligence or intentional wrongdoing by the defendant banks. This argument begs the very question at issue with respect to the dismissed claims: did the defendant banks have a duty to disclose information about Enron's financial condition to the participant banks such that a failure to do so would constitute wrongdoing? Plaintiffs' invocation of the indemnification provisions amounts simply to disagreeing with the Court's decision. Plaintiffs' remaining arguments are similarly meritless.

Plaintiffs have failed to present binding precedent or other matters overlooked by the Court in reaching its October 10th decision; accordingly, Plaintiffs' request for reconsideration is denied. Moreover, even if the Court were to reconsider its decision with respect to the dismissed claims, it would nonetheless adhere to its decision to dismiss those claims with prejudice, for the reasons set forth in the October 10, 2003, Opinion and Order.

■ Plaintiffs also seek, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, entry of final judgment with respect to the dismissed claims. Rule 54(b) provides in pertinent part that, "[w]hen more than one claim for relief is presented in an action ... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason

for delay[.]" The circumstances of this case do not warrant Rule 54(b) certification. The dismissed and remaining claims here arise from essentially the same factual allegations; judicial economy will best be served if multiple appellate panels do not have to familiarize themselves with this case in piecemeal appeals. *Cullen v. Margiotta,* 618 F.2d 226, 228 (2d Cir.1980). Furthermore, Plaintiffs have not shown any "danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Citizens Accord, Inc. v. Town of Rochester,* 235 F.3d 126, 128 (2d Cir.2000) (internal quotation marks and citation omitted). Accordingly, Plaintiffs' request for Rule 54(b) certification is denied.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for reconsideration and Rule 54(b) certification is denied.

SO ORDERED.